LEON R. MEYER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT[1]

LUCILE H. MEYER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT[1]

Docket Nos. 4779–62, 4780–62. Filed April 21, 1966.

---

[1] These cases were heard by Judge Morton P. Fisher and briefs were duly filed. Judge Fisher died on Feb. 11, 1965. These cases, not having been disposed of, were reassigned to Judge John W. Kern on Mar. 2, 1965, and notice was given to the parties that any request for rehearing or reargument might be presented to him within 30 days. No such requests have been received.

*Joseph A. Hoskins* and *Philip J. Erbacher*, for the petitioners. *Merrill R. Talpers*, for the respondent.

Respondent originally determined a deficiency in the income tax liability of petitioner Leon R. Meyer (hereinafter sometimes referred to as Leon) for the year 1959 in the sum of $40,101.55 and a deficiency in the income tax liability of petitioner Lucile H. Meyer (hereinafter sometimes referred to as Lucile) for the year 1959 in the sum of $17,402.09.

The statement attached to the notice of deficiency addressed to Leon indicated the increase of his taxable income as disclosed in his return by the addition thereto of the following items: (1) Capital gains totaling $39,766.39, realized from the sale of 638 shares of Thiokol stock made in the name of Meyer Jewelry Co., a corporation of which most of the stock was owned by Leon and Lucile (sometimes hereinafter referred to as Jewelry) and to which the Thiokol stock had been transferred by Leon shortly before its sale as a contribution to Jewelry's capital; (2) an alleged distribution to Leon from Jewelry on April 13, 1959, of $7,920.50, representing the value on that date of 62 shares of Thiokol stock originally included in the Thiokol stock contributed by Leon to Jewelry but which was eventually reissued in the names of and delivered to Leon and/or his nominees; and (3) the

alleged "payments to [Leon], or on [his] behalf," of $31,328.17 by Jewelry, representing payments made by Jewelry to Lucile, the wife of Leon and a principal stockholder of Jewelry, a large part of which payments were used by her shortly after their receipt by her to make payments to Leon or in satisfaction of Leon's obligations. Because of these increases in Leon's taxable income respondent disallowed a deduction claimed by Leon as a medical expense.

The statement attached to the notice of deficiency addressed to Lucile indicated the increase of her taxable income as disclosed in her return by the addition thereto of the payments made to her by Jewelry in the total amount of $31,328.17.

These cases were consolidated for hearing and opinion.

At the trial herein respondent conceded error in adding to Leon's taxable income the capital gains derived from the sale of the 638 shares of Thiokol stock made by Meyer Jewelry Co. At the close of the hearing respondent moved for leave to amend his answer to conform to the proof by allegations to the effect that the Thiokol stock alleged to have been received by Leon from Jewelry was received by him on April 30, 1959, and May 4, 1959, in the amounts of 124 and 62 shares, respectively, and the total value of such stock on these dates was $10,013. A written amendment to the answer was later filed by respondent to this effect with the leave of the Court.

FINDINGS OF FACT

Petitioner Leon R. Meyer is a resident of Johnson County, Kans., whose separate income tax return for the calendar year 1959 was filed with the district director of internal revenue at Kansas City, Mo.

Petitioner Lucile H. Meyer is a resident of Johnson County, Kans., whose separate income tax return for the calendar year 1959 was filed with the district director of internal revenue at Kansas City, Mo.

Meyer Jewelry Co. was incorporated in the State of Missouri on July 29, 1946. The authorized capital stock of Jewelry at the date of its incorporation was: 1,250 class A shares—$100 par value, and 1,250 class B shares—$100 par value. As of the date of incorporation, both classes of shares authorized by the articles of incorporation of Jewelry had equal rights and preferences, with the exception that the class A shares had voting rights and class B shares were nonvoting. However, changes could be made as to voting rights and preferences by the passage of "Special By-Laws."

Jewelry commenced business with a capital of $500 received from the cash payment for five initially subscribed class A shares. Leon paid in $200 for two shares; Lucile paid in $200 for two shares; and one Sol Silberman paid in $100 for one share.

The one share of class A $100 par value stock acquired by Sol Silberman was held as nominee, one-half share for Leon and one-half share

for Lucile. The cost basis attributable to Leon and Lucile individually of each of said one-half share is one-half of $100 or $50. Lucile's one-half share was eventually transferred to Jack Becker on December 24, 1958.

Prior to the incorporation of Jewelry, a partnership had conducted a jewelry business known as Meyer Jewelry Co. The partners were Leon R. Meyer and Lucile H. Meyer, each having a 50-percent interest.

On August 1, 1946, a special combined meeting of stockholders and directors of Jewelry was held at which a plan of reorganization of Meyer Jewelry Co., the partnership, was discussed. The plan involved the dissolution of the partnership as of the close of business July 31, 1946, the transfer to the newly formed corporation by the partners of all of the assets (except cash of $2,743.13), subject to the liabilities, both as shown on the closing partnership statement, the transfer and assignment of a lease, and the issuance and delivery to Leon of 297½ shares of the class A stock of the corporation and the same number of shares of such stock to Lucile. In addition, there were to be issued and delivered to each of the former partners negotiable promissory notes in the aggregate face amount of $25,000, payable in 10 years from date with interest at 4 percent, payable semiannually.

Pursuant to an agreement entered into on the same date between Leon and Lucile as parties of the first part and Jewelry as party of the second part the following steps were taken: Leon and Lucile transferred all of the partnership assets (except cash of $2,743.13) subject to liabilities, both as shown on the closing partnership statement, to the corporation, and the corporation assumed all of the liabilities, issued to Leon 297½ shares of its class A stock with a par value of $100 and to Lucile 297½ shares of the same class A stock, and issued to each, negotiable promissory notes in the aggregate face amount of $25,000, payable in 10 years from date thereof with interest at 4 percent, payable semiannually. The five notes of Leon's photostatic copies of which were admitted in evidence, all bear the notation on the reverse side: "Interest to and including Sept. 30, 1947/Received/Leon R. Meyer/ Pay to order of/ Meyer Jewelry Co./ Leon R. Meyer/ Cancelled 9/30/47/ Meyer Jewerly Co./ By ————." The five notes of Lucile, photostatic copies of which were also admitted in evidence, bear the notation on the reverse side: "Cancelled 9/30/47/ By Leon R. Meyer, Pres./Meyer Jewelry Co."

The partners' closing investment in the partnership as of July 31, 1946, was:

| | |
|---|---|
| Leon R. Meyer | $56,121.57 |
| Lucile H. Meyer | 56,121.56 |
| | 112,243.13 |

The assets of the partnership transferred to the corporation totaled $315,899.22 ($318,642.35 — $2,743.13) and the liabilities assumed by the corporation totaled $206,399.22. From the closing partnership investment account and assets, $2,743.13 was retained by the partners prior to transfer of assets and property to the corporation. The assets transferred were carried at their cost to the partnership on its books as reflected in the balance sheet of the partnership attached to the minutes of the corporation dated August 1, 1946, and in the agreement entered into by Leon, Lucile, and the corporation dated August 1, 1946.

The combined cost basis of class A $100 par value stock and notes issued to Leon and Lucile, at the incorporation of Jewelry and upon acquisition of the net assets received by the Meyers in dissolution of the partnership, was as follows:

LEON R. MEYER

| | |
|---|---|
| 300 shares—class A—$100 par value stock | $30, 000 |
| $25,000 aggregate face value 10-year negotiable notes, 4-percent interest | 25, 000 |
| | 55, 000 |

LUCILE H. MEYER

| | |
|---|---|
| 300 shares—class A—$100 par value stock | $30, 000 |
| $25,000 aggregate face value 10-year negotiable notes, 4-percent interest | 25, 000 |
| | 55, 000 |

On September 30, 1947, a combined meeting of stockholders and directors of Jewelry was held. At the meeting the officers of the corporation were authorized to issue 250 class B shares to Leon and 250 class B shares to Lucile in exchange for their notes of the corporation, exclusive of unpaid interest, subject to the provisions of the special bylaws of the corporation adopted at the same meeting. These special bylaws provided for a priority of dividends to the class B shares of $6 per share in respect of each fiscal year, and made the class B shares subject to redemption at any time at the par value thereof, on compliance with the restrictions and limitations of the laws of Missouri. Moreover, the right to vote was granted to the class B shares. The purpose of this exchange was to improve the balance sheet of the corporation for credit purposes by the capitalization of what appeared on its balance sheet as a $50,000 liability to Leon and Lucile.

Pursuant to these minutes, 250 shares of class B ($100 par value) stock were issued to Leon and the same number of shares of the same stock to Lucile in exchange for the notes described above being $25,000 of notes payable to each.

No dividends were ever paid by Jewelry on any of its capital stock during the period 1946 through 1958.

On May 31, 1956, an involuntary bankruptcy petition was filed in the U.S. District Court for the Western District of Missouri at Kansas City, Mo., against the Meyer Jewelry Co. Thereafter, Jewelry filed an answer denying that it was insolvent. On June 18, 1956, Jewelry filed a debtor's petition stating that it was unable to pay its debts as they mature, proposing an arrangement with its unsecured creditors, and praying for a proceeding in accordance with chapter XI of the Bankruptcy Act (11 U.S.C. sec. 721). The proposed arrangement called for the payment of all administrative expenses and priority claims such as taxes in cash by Jewelry.[2] The proposal divided the unsecured creditors into the following three classes: (1) Claims which were incurred prior to April 17, 1956, were to be paid to the extent of 30 percent; (2) claims for merchandise incurred subsequent to April 17, 1956, were to be paid in full; and (3) an obligation in the amount of $7,500 to the Jewelers Board of Trade in connection with negotiations with creditors was to be paid in full.

As part of the proposed arrangement, Jewelry had negotiated a $100,000 loan from Commerce Trust Co., Kansas City, Mo., such loan to be guaranteed individually by Leon and partially guaranteed by certain friends of Leon. In addition, Leon agreed to contribute to the corporation $25,000 cash as additional working capital.

Among provisions included in the terms of the loan by Commerce Trust Co. to Jewelry were the following: Leon was to put not less than $25,000 into Jewelry as working capital; Leon was to guarantee payment of the note to Commerce Trust Co.; Leon and Lucile were to pledge as surety for the guaranty of Leon all issued and outstanding capital stock of Jewelry, except such part thereof, not to exceed 25 percent, as might be distributed to key employees of Jewelry, including Richard Burstein and Louis S. Meyer; and the corporation was to deliver to Commerce Trust Co. the written guaranty of six individuals in Kansas City, Mo., designated by name.

The loan by Commerce Trust Co. was to bear interest at 5 percent, payable quarterly, and was to be evidenced by a 90-day note, renewable not to exceed 19 extensions, provided the corporation was operating on a satisfactory basis. A payment of $10,000 was to be made on this note at the end of the second quarter, and thereafter $5,000 per quarter was to be paid thereon. The loan of $100,000 to Jewelry was completed, and Lucile consented to the pledge of her shares of stock in Jewelry.

In order to raise the $25,000 required to be contributed as working capital, Leon obtained $10,000 by cashing in a certain life insurance policy, under which Lucile was beneficiary, and borrowed an additional $15,000 from Commerce Trust Co. secured by 798 shares of

---

[2] According to the proposed arrangement, the tax claims amounted to $4,967.12.

stock of Thiokol Corp. (now Thiokol Chemical Corp.), sometimes hereinafter referred to as Thiokol. At that time the 798 shares of Thiokol stock thus pledged had a fair market value of approximately $30,000. Subsequently, as hereinafter noted, the value of this stock greatly increased in value and the number of shares held in pledge increased by reason of stock dividends, stock splits, and the exercise of rights to purchase by Leon.

In June of 1956, Leon paid to Jewelry the sum of $25,000, as required by the proposed arrangement, in exchange for which there was issued to him under date of July 3, 1956, a certificate for 250 shares of class B stock of the corporation.

On July 3, 1956, the court confirmed the arrangement proposed by Jewelry and accepted by a majority in number of each class of affected creditors. The order confirming the arrangement recited the fact that Jewelry had paid into the bankruptcy court the sum of $103,953.54.

On July 10, 17, and 19, 1956, the court entered its orders of distribution reflecting the amount of the claims against Jewelry incurred prior to April 17, 1956, and the amounts to be distributed to these creditors in full and final discharge of these claims.

According to the distribution orders of the court, Jewelry had incurred unsecured claims prior to April 17, 1956, in the total amount of $271,121.71, of which the creditors were paid 30 percent thereof or $81,336.29 [3] pursuant to the terms of the confirmed arrangement. The difference between the total amount of the unsecured claims incurred prior to April 17, 1956, and the amounts paid to these creditors in full and final discharge of these claims was $189,785.42.

The order of the court also required the payment in full of the $7,500 obligation to the Jewelers Board of Trade and the payment of $12,672.92, in full satisfaction of unsecured debts incurred subsequent to April 17, 1956.

In anticipation of the bankruptcy proceeding, Jewelry's accountant credited an account designated "Contributed capital" on the balance sheet in the amount of $178,211.16. This figure purports to represent the total amount of debts discharged, less the $7,500 payment to the Jewelers Board of Trade and certain estimated tax and administrative expenses.[4]

Jewelry's accountant also arranged for the write-down of the in-

---

[3] Although 30 percent of $271,121.71 is $81,336.51, the court orders employed the figure as indicated. Nothing in the record explains this discrepancy.

[4] Although this figure was used on Jewelry's balance sheet as of June 30, 1956, petitioners' computations on brief result in the figure $179,746.36 ($189,785.42 — ($7,500 + $2,539.06)). There is nothing in the record to explain this discrepancy. While these computations include the reduction of $2,539.06 for "Tax and Administrative expenses— Est.," there is nothing in the record to support this latter figure.

ventory and certain other assets [5] of Jewelry in the amount of $64,000. The inventory reduction was first noted in the journal as debits of $64,000 to "Cost of sales" and corresponding credits in the same amount to "Inventory." The accounts and notes receivable adjusting journal entries were as follows:

| | |
|---|---|
| Insurance claim pending_____ | $4, 795. 79 |
| Bad debt reserve_____ | 7, 219. 17 |
| Bad debt expense_____ | 10, 886. 84 |
|     Accounts receivable_____ | $18, 956. 75 |
|     Notes receivable_____ | 3, 945. 05 |

The net reduction in accounts and notes receivable as reflected by these journal entries is $10,886.84.[6]

The reductions were then reflected in the amounts at which these assets were carried on the balance sheet of Jewelry. These entries were executed 3 days prior to and in anticipation of the bankruptcy order and reflected the reappraisal of the assets in question to their respective fair market values.

The income statement of Jewelry for the year ended June 30, 1956, which was submitted in evidence, contains the following items taken as expenses: "Bad debts $18,106.01," "Discounts allowed $7,486.99," "Taxes $6,910.15," and "Miscellaneous $8,678.58." Across the face of the income statement is the penciled notation "65,000 Invtry writeoff." [7]

The earned surplus of Meyer Jewelry Co. on June 30, 1955, as shown on its Federal income tax return, was $21,970.23. Taxable income or loss, as reflected on its Federal income tax returns, for the succeeding years was as follows:

| | |
|---|---|
| Loss for year ended June 30, 1956_____ | ($132, 582. 37) |
| Loss for year ended June 30, 1957_____ | (16, 147. 89) |
| Loss for year ended June 30, 1958_____ | (69, 941. 20) |
| Taxable income for year ended June 30, 1959, including reported taxable gain of $81,228.17 on sale of 638 shares of Thiokol Chemical Corp. stock_____ | 66, 007. 10 |
| Taxable income for year ended June 30, 1960_____ | 2, 492. 13 |

---

[5] Described in the journal of Jewelry as "materials," "mountings," and "shop" with respective write-downs of $50,000, $8,000, and $6,000.

[6] We believe the net reduction in the accounts and notes receivable to be $10,886.84. The debit to "Insurance claim pending" is an increase in an asset account and the companion credits indicate that the insurance claim was reclassified by taking it out of accounts or notes receivable. The debit to "Bad debt reserve" normally indicates a reduction in a liability account set up to estimate uncollectible accounts receivable. As such, this entry is not a write-down in an asset account arising out of an expense or a forgiveness of indebtedness. The corresponding credit might well indicate that certain amounts estimated uncollectible proved collectible in part. While we would not go so far as to attribute income to Jewelry because of this entry, we find no justification for treating the $7,219.17 debit as an asset write-down.

[7] Despite this notation, the journal entries indicate total write-downs of $64,000. See fn. No. 5, *supra.* Nothing in the record explains this discrepancy.

The Federal income tax returns filed by Jewelry for the years ended June 30, 1955, through June 30, 1960, indicate that Jewelry made the following charitable contributions which were not taken as deductions because of the 5-percent limitation of section 170(b)(2) of the 1954 Code:

| Year ended June 30 | Contributions |
|---|---|
| 1955 | $1,090.88 |
| 1956 | 780.00 |
| 1957 | 452.50 |
| 1958 | 587.03 |
| 1959 | 425.00 |
| 1960 | 375.00 |

The loss for the year ended June 30, 1956, includes the $64,000 write-down in inventory which was reflected on its books by debits in that amount to "Cost of sales" and corresponding credits to "Inventory." This $64,000 write-down in inventory was reflected in the "Cost of Sales" entry on the income statement of Jewelry for the year ended June 30, 1956. Although the net reduction of accounts and notes receivable by the journal entries was $10,886.84 (see fn. 6, *supra*), the income statement of Jewelry for the year ended June 30, 1956, contains an item of $18,106.01 opposite the account "Expenses: Bad debts." [8]

On September 22, 1958, by action of the stockholders and directors of Jewelry, the special bylaws were amended so that all preferences, qualifications, limitations, restrictions, and all special or relative rights of class A and class B shares of the corporation became identical and as if all the class A and class B shares were of the same and identical class.

On December 24, 1958, Lucile transferred by gift class A shares of Jewelry to the individuals listed below, all of whom were employees of Jewelry as follows: Jack Becker—50 shares class A, $100 par value; Richard C. Burstein—50 shares class A, $100 par value; Louis S. Meyer—30 shares class A, $100 par value. Louis S. Meyer and Richard C. Burstein are respectively the son and son-in-law of Leon and Lucile; Jack Becker is unrelated to the Meyers. Included in the transfer to Jack Becker on December 24, 1958, was the one-half share originally held as nominee for Lucile by Sol Silberman.

On February 13, 1959, Lucile transferred by gift the following shares of class A stock of Jewelry to the same individuals: Jack Becker—50 shares class A, $100 par value; Richard C. Burstein—50 shares class A, $100 par value; Louis S. Meyer—30 shares class A, $100 par value. Included in the transfer to Jack Becker on February

---

[8] It appears that the $18,106.01 figure is the sum of the following two debits in the journal: $10,886.84 to "Bad debt expense" and $7,219.17 to "Bad debt reserve."

13, 1959, were the two shares issued to Lucile on July 30, 1946, for cash at the original incorporation.

The holdings of class A and class B stock of the corporation on April 1, 1959, were as follows:

CLASS A STOCK $100 PAR VALUE

| | Number of shares | Par value |
|---|---|---|
| Leon R. Meyer | 300 | $30,000 |
| Lucile H. Meyer | 40 | 4,000 |
| Jack Becker | 100 | 10,000 |
| Richard C. Burstein | 100 | 10,000 |
| Louis S. Meyer | 60 | 6,000 |
| Total outstanding | 600 | 60,000 |

CLASS B STOCK $100 PAR VALUE

(*Identical with class A stock as of Sept. 22, 1958*)

| | | |
|---|---|---|
| Leon R. Meyer | 500 | 50,000 |
| Lucile H. Meyer | 250 | 25,000 |
| Total outstanding | 750 | 75,000 |
| Total stock | 1,350 | 135,000 |

Prior to April 1, 1959, and beginning in the latter part of 1958, a plan was evolved to eliminate the bank indebtedness of Jewelry to Commerce Trust Co. This liability was still outstanding due to the loan of $100,000 by Commerce Trust Co. made in June of 1956. This loan enabled the chapter XI bankruptcy arrangement to be carried out. The plan also envisioned the elimination of the capital investment of Lucile in Jewelry by means of a distribution to her of cash and the surrender and cancellation of the stock certificates of Jewelry owned and held by her. The price to be paid to Lucile in redemption of her stock was not agreed upon at this time, but it was assumed that she would be paid either the book value ($37,337.50) or par value ($29,000) of the shares. The feasibility of this plan was predicated on the increase in value of the Thiokol stock of Leon held by Commerce Trust Co. as collateral securing Leon's note for $15,000 and the availability of such stock or a considerable part of it to Leon and, through him, to Jewelry.

Pursuant to the plan to eliminate the indebtedness of Jewelry to Commerce Trust Co. which then amounted to $50,000 and to provide funds with which the company could make a distribution of cash to Lucile, Leon on or before April 1, 1959, contributed to Jewelry as a capital contribution 700 shares of the 1,848 shares of Thiokol stock which at that time was held as collateral by Commerce Trust Co.

to secure the note executed by Leon for $15,000. The 1,848 shares of Thiokol then held as collateral by the bank represented the 798 shares originally pledged by Leon as proliferated by stock dividends, stock splits, and the exercise by him of rights to purchase additional shares. During the period 1956 to 1959 this stock had tremendously increased in value.

On April 1, 1959, the board of directors of Jewelry adopted a resolution to the effect that it was the "owner of 700 shares of the capital stock of Thiokol" identified by 13 certificate numbers; authorized the president or treasurer of the corporation to sell the shares of stock or any part of them; authorized Commerce Trust Co. or any broker selected by Commerce Trust Co. to handle the sale of said shares on behalf of the corporation; and authorized Commerce Trust Co. to receive the remittance or remittances issued in the name of the corporation and to deposit such remittance or remittances to the account of the corporation in the Commerce Trust Co. Leon was president and a director of Jewelry.

On April 2, 1959, Commerce Trust Co. delivered, as shown by its receipt, certificates representing 700 shares of Thiokol stock to Stern Bros. & Co., Kansas City, Mo., brokers, with endorsements from Leon to Jewelry and stock powers to Stern Bros. & Co. attached to the certificates executed by Jewelry with all endorsements guaranteed by the bank, the instructions of the bank to Stern Bros. & Co., written by one of its assistant cashiers, being in part:

We understand Mr. Meyer has instructed you in regard to selling this stock. We also understand that it is to be sold sometime this month.

As funds are received, check should be made payable to the Meyer Jewelry Company and delivered to the Commerce Trust Company, attention the writer or Harry Wuerth.

On April 2, 1959, Stern Bros. & Co. issued a letter of instruction to the United States Corporation, Stock Transfer Department, Jersey City, N.J., requesting that 13 certificates of Thiokol stock aggregating in total 700 shares (which were enclosed in the letter) be reissued in its name in seven 100-share certificates. Stern Bros. & Co. received from the transfer agent six certificates for 100 shares each, certificate number 3671 for 38 shares and certificate number 3672 for 62 shares of Thiokol stock. These eight certificates were transferred on the books of Thiokol Chemical Corp. to the name of Stern Bros. & Co. on April 27, 1959.

On various dates from April 6, 1959, through April 13, 1959, Stern Bros. & Co. effected sale of 638 shares of stock of Thiokol on the New York Stock Exchange for the account of Jewelry. The dates and

prices, net after commissions and charges, at which the shares were sold were:

| Date | Number of shares | Trade price | Net proceeds |
|---|---|---|---|
| 1959 | | | |
| Apr. 6 | 100 | 131 | $13,038.14 |
| Apr. 7 | 100 | 127 | 12,638.71 |
| Do | 100 | 126⅞ | 12,626.22 |
| Do | 100 | 127¼ | 12,663.68 |
| Apr. 8 | 100 | 128 | 12,738.57 |
| Apr. 9 | 100 | 128¾ | 12,813.45 |
| Apr. 13 | 38 | 127¾ | 4,809.40 |

The sales of the 638 shares of Thiokol stock by Stern Bros. & Co. were made at Leon's request.

The income tax return of Jewelry for the year ended June 30, 1959, indicates that the basis of the 638 shares of Thiokol stock sold during that period for $81,328.17 was $100.

On or about April 15, 1959, Commerce Trust Co. received from Stern Bros. & Co. its check payable to the order of Jewelry in the amount of $76,518.77, representing the proceeds of the sale of 600 shares of Thiokol stock. Upon receipt of this check the treasurer of Jewelry endorsed the check on behalf of Jewelry and the same was deposited to the account of Jewelry in the bank on April 15, 1959.

On or about May 1, 1959, Commerce Trust Co. received a second check from Stern Bros. & Co., payable to the order of Jewelry in the amount of $4,809.40, representing the proceeds of the sale of 38 shares of Thiokol stock. This check was similarly endorsed on behalf of Jewelry by its treasurer and deposited to the account of Jewelry in the Commerce Trust Co.

On May 4, 1959, Stern Bros. & Co. transmitted by letter to the United States Corporation, Stock Transfer Department, Jersey City, N.J., certificate 3672 for 62 shares of stock of Thiokol. This was the same certificate 3672 for 62 shares received from United States Corporation in response to the letter dated April 2, 1959, from Stern Bros. & Co. to United States Corporation. Pursuant to said letter of instruction dated May 4, 1959, from Stern Bros. & Co., which was written at Leon's request, 30 of these 62 shares were transferred on the records of the transfer agent on May 7, 1959, to the following individuals: Louis S. Meyer (the son of petitioners) and Mrs. Betty Lee Meyer, J/T/R/S (15 shares); Richard C. Burstein and Mrs. Suzanne Burstein (the daughter of petitioners), J/T/R/S (15 shares); and 32 of these 62 shares were reissued in the name of Leon Meyer.

Shares of Thiokol stock were split in April of 1959, when two additional shares were issued for each share outstanding in order to

accomplish a 3 for 1 split. The split was effective as of record date April 20, 1959, and the distribution of the additional shares was on April 30, 1959. The stock sold "Ex-dividend" on May 1, 1959. The sales of 638 shares of Thiokol stock effected on various dates from April 6 to April 13, 1959, carried with the shares sold the additional shares produced by the stock split so that Leon as the record owner was required to deliver the additional shares resulting from the split to the purchasers in the trades effected by Stern Bros. & Co. Leon retained the 124 shares distributed to him pursuant to the split on April 30, 1959, as the record owner of the 62 shares which had not been sold. The books of Jewelry contain no account receivable from Leon on account of his receipt of the 62 or the 124 shares of Thiokol stock, and no payment has ever been made by him to Jewelry on account thereof.

The parties have stipulated that the high and low bids for Thiokol stock on April 20, April 27, May 4, and May 7, 1959, were as follows:

|         | High | Low |
|---------|------|-----|
| Apr. 20 | $149.75 | $146.00 |
| Apr. 27 | 162.00 | 154.50 |
| May 4 [1] | 53.75 | 59.75 |
| May 7 [1] | 69.87½ | 62.00 |

[1] After 3 for 1 split the parties have also stipulated that on Apr. 30, 1959, "the old stock of Thiokol Chemical Corp., prior to split, was selling at a low of $153.75 and a high of $161.50, and the split stock was selling at a low of $51 per share and a high of $53.87½ per share."

The sale of the 638 shares of stock of Thiokol executed by Stern Bros. & Co., brokers, on various dates from April 6, 1959, through April 13, 1959, was for the account of Jewelry, a corporation, and represented sales by and on behalf of Jewelry and not the sales of property owned by Leon.

On April 15, 1959, Jewelry used the sum of $50,000 from the proceeds ($76,518.77) of the sale of 600 shares of stock of Thiokol to satisfy the balance of $50,000 remaining on the $100,000 note evidencing the loan of June 1956 by Commerce Trust Co. to Jewelry.

On April 18, 1959, Jewelry issued its check drawn on its account at Commerce Trust Co. to the order of Lucile in the amount of $26,518.77. The amount of this check represented the difference between $76,518.77 paid to Jewelry, being the proceeds of the sale of 600 shares of Thiokol stock, and the $50,000 paid by Jewelry in satisfaction of its obligation to Commerce Trust Co. On May 1, 1959, Lucile received a second check from Jewelry in the amount of $4,809.40. This check equaled the proceeds from the sale of 38 shares of Thiokol stock for the account of Jewelry. The sum of these two payments is $31,328.17. Jewelry made debit entries on an account receivable in

its books entitled "Mrs. Lucile Meyer" in the amounts and at the time of these payments. Prior to these entries this account reflected small debits never in excess of $75 with balances due never in excess of $311. No interest was charged on this receivable, no note was ever given for any indebtedness shown thereon, and no formal security was given for the repayment of any balance.

No formal restrictions were imposed on Lucile with regard to her use of the money received by her from Jewelry. It was the intention of all of the parties concerned that these payments or a part of them would ultimately constitute a distribution to Lucile in redemption of all of her stock in Jewelry at a price later to be decided upon representing either the par value or book value of such stock. Lucile delivered her stock for redemption to the general counsel of Jewelry who kept its stock records in the late summer or early fall of 1959. Sometime between June 30 and December 31, 1959, the parties agreed that the price to be paid to Lucile in redemption of her stock should be its par value, $29,000, rather than its book value, which according to Jewelry's income tax return for the year ended June 30, 1959, was $37,337.50.

On December 31, 1959, an entry was made on the books of the corporation, crediting the ledger account receivable designated "Mrs. Lucile Meyer" with the sum of $29,000 and debiting or reducing capital stock accounts in the total amount of $29,000, the individual entries being debits to an account labeled "Capital Stock—Common 'A'—$4,000.00" (40 shares) and "Capital Stock—Common 'B'—$25,000.00" (250 shares). The difference of $2,328.17 between the total of the two payments to Lucile from the proceeds of the sales of the Thiokol stock ($31,328.17) and the $29,000 credited to her account in connection with the redemption of her stock continued to be carried in her account with Jewelry as a receivable, this ledger account showing a debit balance of not less than $2,472.89 as of December 31, 1959, and not more than $2,623.86, the latter figure representing the balance as of May 25, 1961, the date of the last entry therein. Amounts recorded as debits to this account were not represented by notes from Lucile, did not require any interest to be paid by her, were not payable at a fixed maturity date, were not secured by any of Lucile's assets, and, so far as the record discloses, were never paid.

Two factors contributing to the delay in the submission by Lucile of the 40 shares of class A stock and 250 shares of class B stock for redemption and cancellation were the absence of Lucile on a foreign trip, hereinafter referred to in greater detail, and the summer vacation of counsel for the company, who acted as keeper of the stock records.

After the redemption, the stock ownership of the Meyer Jewelry Co. was as follows:

|  | Number of shares [1] | Percentage of ownership |
|---|---|---|
| Leon R. Meyer | 800 | 75. 47 |
| Jack Becker | 100 | 9. 435 |
| Richard C. Burstein | 100 | 9. 435 |
| Louis S. Meyer | 60 | 5. 66 |
| Total | 1, 060 | 100. 00 |

[1] Includes ownership in both class A and class B shares which are deemed to be of the same and identical class as a result of an amendment of the special bylaws of the corporation at the stockholder meeting of Sept. 22, 1958.

The original and remaining cost basis of Lucile in the 40 shares of class A $100 par value stock and 250 shares of class B $100 par value stock of Jewelry was $29,000. No distributions had ever been made by the corporation in the form of a return of capital.

At the Community State Bank, Kansas City, Mo., petitioners maintained two joint bank accounts. One account was entitled "Leon Meyer or Lucile Meyer," referred to in these findings as joint bank account A. The other account was entitled "Lucile Meyer or Leon Meyer," referred to in these findings as joint bank account B. Bank statements and canceled checks on joint bank account A were sent to Leon. Bank statements and canceled checks on joint bank account B were sent to Lucile.

On April 20, 1959, Lucile deposited the $26,518.77 check of Jewelry dated April 18, 1959, payable to her, in joint bank account B. Lucile drew a check on joint bank account B, dated April 18, 1959, payable to Commerce Trust Co. in the amount of $15,000. This check was utilized on April 20, 1959, to pay the note executed by Leon to the Commerce Trust Co. in the amount of $15,000, which was then secured by 1,148 shares of Thiokol stock and which had been secured by 1,848 shares of such stock prior to the execution (with the consent of the bank) of the plan already detailed in our findings, which plan was predicated on the withdrawal by Leon of 700 of these shares, his contribution of these shares to Jewelry and its sale thereof.

Lucile drew a check upon joint bank account B, dated April 19, 1959, payable to the Community State Bank in the amount of $8,000. This check was utilized on April 20, 1959, to pay three notes executed by both Leon and Lucile in the total amount of $8,000.

Lucile drew a check upon joint bank account B, dated April 18, 1959, in the amount of $3,000 to the order of Leon. On April 20, 1959, this check was deposited to joint bank account A.

On May 4, 1959, Lucile deposited in joint bank account B the check for $4,809.40 of Jewelry received by her on May 1, 1959.

On May 1, 1959, Lucile drew a check dated May 1, 1959, upon joint bank account B in the amount of $4,000 to the order of Leon. On May 4, 1959, this check was deposited to joint bank account A.

Prior to 1959, the customary family practice was that Lucile would advance to Leon the estimated expenses of vacation trips taken by them. After the trip, Leon would return to Lucile any of the advanced funds which were not spent.

In the early part of 1959 the health of Leon had not been good. He had severe hypertension and also had undergone a cataract operation. Following this operation a trip to Sarasota, Fla., had been taken by the Meyers. The trip was paid for by Lucile. Following the trip to Florida the doctor recommended that Leon take a long vacation. Later in 1959, Leon and Lucile were invited by friends of many years standing to join them on a trip to Europe. Leon objected to taking such a trip, but Lucile strongly advanced an opposite view. The outcome of the family discussion was that both Leon and Lucile went to Europe.

The checks drawn by Lucile upon joint bank account B to the order of Leon for $3,000, dated April 18, 1959, and $4,000, dated May 4, 1959, and deposited in joint bank account A were transferred and used for the purposes of financing the trip to Europe by Leon and Lucile.

Of the checks totaling $7,000, described above, the approximate sum of $6,000 was used for the purpose of the trip to Europe. The amount not spent was returned to Lucile. No formal requirements were imposed upon Lucile to use any part of the moneys received by her from Jewelry to finance the trip to Europe.

Neither Leon nor Lucile have ever filed with respondent the agreement prescribed in section 302(c)(2)(A)(iii) of the 1954 Code and specifically described in section 1.302–4(a), Income Tax Regs.

At the time of the distribution to Lucile here involved and throughout the fiscal years of Jewelry ended June 30, 1959, 1960, 1961, and 1962, Lucile received the sum of $7,500 a year as vice president of Jewelry, devoting part of her time to the business in each of those years.

OPINION

KERN, *Judge:* With regard to the payments made by Jewelry to Lucile in the total amount of $31,328.17, respondent argues with great vigor that they constituted distributions of dividends to her which were includable as such in her taxable income. In the alternative and with much less vigor, respondent argues that they constituted similar income of Leon since these payments to Lucile were either used by her immediately after their receipt for the satisfaction of Leon's obligations or were paid over to Leon.

With regard to the 186 shares of Thiokol stock which were finally issued in the names of and delivered to Leon and to his donees (his son and daughter-in-law and his daughter and son-in-law), respondent argues that they constituted dividends distributed to Leon by Jewelry and as such were taxable to him at their fair market value at the date of issuance.

Petitioners in their voluminous briefs have advanced many arguments with regard to both procedural and substantive questions. As to some of the procedural questions, these arguments repeat with elaboration the arguments of counsel at or shortly after the trial herein and have been decided by Judge Fisher. As to the others, petitioners particularly press their contentions that respondent's determinations of deficiency herein have been in some way vitiated or deprived of their presumption of correctness because (1) respondent's determination that Leon in reality owned and sold the 638 shares of Thiokol stock and derived capital gains thereby, rather than Jewelry (as to which respondent conceded error at the trial) was inconsistent with his determination in Leon's case that the distribution by Jewelry of a part of the proceeds to him constituted taxable income and with his determination in Lucile's case that it constituted income taxable to her and (2) respondent's determination in Leon's case that the distribution by Jewelry of $31,328.17 was made to him or for his benefit was inconsistent with his determination in Lucile's case that the same distribution was made by Jewelry to her and should be added to her taxable income. Petitioners argue not only that these inconsistencies cause the respondent's determination to lose the presumption of correctness normally attaching to determinations of deficiency but also that these inconsistencies indicate such arbitrariness and capriciousness on the part of respondent as to render them invalid. We disagree. Respondent may take inconsistent positions for the purpose of protecting the revenue without causing his determinations to lose their presumptive correctness. See *Revell, Inc.* v. *Riddell*, 273 F. 2d 649. In the instant cases the facts as disclosed by the record indicate such ambiguity with reference to the crucial transactions as to cause us to reject petitioners' contention that respondent's inconsistent determinations, made for the purpose of protecting the revenue, were arbitrary and capricious. The ambiguous character of the transactions is such as frequently exists in cases involving a small corporation controlled by a cohesive family group with informal and often incomplete corporate records. In the instant cases it appears to us that the respondent in order to protect the revenue acted reasonably and in good faith, rather than arbitrarily, in making his determinations of deficiency. See *Nat Harrison Associates, Inc.*, 42 T.C. 601, 617. Here, as in that case "counsel for respondent made it clear that the deter-

minations were in the alternative and that respondent did not contend that the [income items] should be taxed more than once." We conclude that since respondent's inconsistent determinations were made reasonably and in good faith for the purpose of protecting the revenue and were intended to be in the alternative, they have not lost their presumptive correctness by reason of their inconsistency. Petitioners' reliance upon *Revell, Inc.* v. *Riddell, supra,* is misplaced. See *Sanford Reffett,* 39 T.C. 869, 875.

The fact that respondent has conceded error with regard to one of his grounds for deficiency, as stated in the deficiency notice addressed to Leon, does not affect the validity of the other grounds in view of our opinion that the ground abandoned by respondent though conceded to be erroneous was not arbitrary or unreasonable in the light of the facts available to respondent. See *Hoffman* v. *Commissioner,* 298 F. 2d 784, 788; *Clark* v. *Commissioner,* 266 F. 2d 698, 706, 707.

We turn now to a consideration of the substantive issues presented.

The first one to be considered is whether respondent erred in his determination that the payments of $31,328.17 made by Jewelry to Lucile constituted taxable income of Lucile.

Respondent first contends that they constituted dividend distributions made to Lucile by Jewelry in the fiscal year of Jewelry ended June 30, 1959, during which Jewelry had current net earnings in the approximate amount of $66,000 and cannot be considered as having been made in redemption of her stock in Jewelry, which redemption was accomplished much later in the calendar year 1959 and in Jewelry's fiscal year 1960 when its income was only in the amount of $2,500. Respondent further contends that in the event we find that the payments were made to Lucile as a step in the ultimate redemption of her stock in Jewelry's fiscal year 1960, they were nevertheless equivalent to the distribution of a dividend and that Jewelry's accumulated earnings and profits in its fiscal year 1960 were in excess of such payments.

Petitioners contend that these payments were made to Lucile as a step in the ultimate redemption of her stock in Jewelry's fiscal year 1960; that the distributions to Lucile were not equivalent to the distribution of a dividend; that in any event Jewelry had no accumulated earnings and profits in that year and its income available for the payment of dividends was not in excess of $2,500; and that to the extent of $25,000, these payments should be considered as the payment to Lucile on account of the notes of Jewelry for which 250 shares of its class B stock were exchanged in 1947 and with regard to which her basis was $25,000.

If respondent be correct in his contention that the distributions to Lucile in April and May of 1959 did not constitute a step in the re-

demption of her stock and that the surrender and redemption of her stock which occurred in December 1959 was only conceived and executed at this much later time for the sole purpose of effecting a tax advantage, then there would be little question but that the distributions would be taxable as dividends to Lucile in their full amount under section 316(a) of the Internal Revenue Code of 1954.[9]

However, after a careful consideration of the record herein, we have concluded that in spite of the considerable lapse in time between the payments to Lucile by Jewelry and the surrender and redemption of her stock, they were parts of one planned transaction, and the payments to her constituted a step in the redemption of her stock which was accomplished in Jewelry's fiscal year 1960. See *American Bantam Car Co.*, 11 T.C. 397, 406–407, affd. 177 F. 2d 513. In reaching this conclusion we have particularly relied on the following: (a) The surrender and redemption of the stock did follow within the same calendar year the payments to Lucile; (b) the categorical testimony of Leon, Lucile, and the attorney for them and for Jewelry who kept the stock records of Jewelry was to the effect that Leon, Lucile, and Jewelry intended the payments to Lucile to be steps in the redemption of Lucile's stock at the time they were made, which testimony is questioned by respondent principally on account of the lapse of time between the payments and the surrender and redemption of the stock; and (c) our belief that this lapse of time is a fact which loses its significance against the background of informality which characterized the conduct of Jewelry's corporate affairs vis-a-vis its controlling stockholders, Leon and Lucile, an informality which, as we have already commented in a context unfavorable to a contention of petitioners, is not unusual in situations where a relatively small corporation is owned and controlled by a small cohesive family group.

We have chosen to characterize the distribution to Lucile as having occurred in Jewelry's fiscal year ended June 30, 1960, because we believe that at the time the payments were made to her, they constituted bona fide accounts receivable of Jewelry. These accounts were to be paid upon the redemption of Lucile's stock when the price per share was agreed upon. At the time the payments were made to Lucile, the par-

---

[9] SEC. 316. DIVIDEND DEFINED.

(a) GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913, or

(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

ties anticipated that the redemption of her stock would take place several months later, a fact which convinces us that the open account receivable was subject to an informal obligation on her part to redeem her stock in return for the *pro tanto* satisfaction of this account, when the price for such redemption was fixed and the company counsel was available to oversee the transaction. We believe that this informal understanding coupled with the short length of time during which the receivable was carried (at most 6 or 7 months) establishes the *bona fides* of Lucile's obligation to Jewelry until and to the extent the ultimate redemption price was fixed at $29,000. Because it was contemplated that the price for the stock would be either the par value ($29,000) or the book value ($37,337.50), we believe that the account receivable maintained its *bona fides* as to the full amount of the distribution to Lucile ($31,328.17) until the redemption price was fixed several months later. We reach this conclusion despite the failure of the parties to draft notes and impose interest on these advances. In view of the above, we therefore hold that any possible dividend distribution occurred at the time Lucile's stock was redeemed in payment of her account, i.e., during Jewelry's fiscal year ended June 30, 1960.

This conclusion forces us to the consideration of other questions, most of which are difficult and one of which has been described in some opinions by even more forceful adjectives. See *Thomas G. Lewis*, 35 T.C. 71, 76; *Wilson* v. *United States*, 154 F. Supp. 341, 342, affd. 257 F. 2d 534; *United States* v. *Fewell*, 255 F. 2d 496, 499.

The first of these is a general question which involves subsidiary questions. It is whether the redemption of Lucile's stock by Jewelry was essentially equivalent to the payment of a dividend. If it was not, then the payments would be considered as "a distribution in * * * full payment in exchange for the stock." See sec. 302 (a) and (b) (1), I.R.C. 1954.[10]

We are compelled to consider the application of section 302(b) (1) because sections 302(b) (2),[11] 302(b) (3),[12] and 302(b) (4)[13] are inapplicable. The inapplicability of section 302(b) (4) is obvious. Sections 302(b) (2) and 302(b) (3) are inapplicable because of the

---

[10] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

[11] Sec. 302(b)(2). SUBSTANTIALLY DISPROPORTIONATE REDEMPTION OF STOCK.—

(A) In General.—Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder.

(B) Limitation.—This paragraph shall not apply unless immediately after the redemption the shareholder owns less than 50 percent of the total combined voting power of all classes of stock entitled to vote.

provisions of section 302(c)(1)[14] which make section 318(a)[15] applicable "in determining the ownership of stock for purposes of * * * [sec. 302]." The exception provided in section 302(c)(2)(A)[16] does not apply here since immediately after the distribution to Lucile, here in question, she was and continued to be for at least 2 years, a salaried officer of Jewelry. In this connection it should also be noted that Lucile did not file, and so far as the record here discloses has never filed, the agreement called for by section 302(c)(2)(A)(iii). Cf. *Georgie S. Cary*, 41 T.C. 214.

---

(C) Definitions.—For purposes of this paragraph, the distribution is substantially disproportionate if—

(i) the ratio which the voting stock of the corporation owned by the shareholder immediately after the redemption bears to all of the voting stock of the corporation at such time,

is less than 80 percent of—

(ii) the ratio which the voting stock of the corporation owned by the shareholder immediately before the redemption bears to all of the voting stock of the corporation at such time.

For purposes of this paragraph, no distribution shall be treated as substantially disproportionate unless the shareholder's ownership of the common stock of the corporation (whether voting or nonvoting) after and before redemption also meets the 80 percent requirement of the preceding sentence. For purposes of the preceding sentence, if there is more than one class of common stock, the determinations shall be made by reference to fair market value.

(D) Series of Redemptions.—This paragraph shall not apply to any redemption made pursuant to a plan the purpose or effect of which is a series of redemptions resulting in a distribution which (in the aggregate) is not substantially disproportionate with respect to the shareholder.

[12] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

   \*        \*        \*        \*        \*        \*

(3) TERMINATION OF SHAREHOLDER'S INTEREST.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

[13] Sec. 302(b)(4). STOCK ISSUED BY RAILROAD CORPORATIONS IN CERTAIN REORGANIZATIONS.—Subsection (a) shall apply if the redemption is of stock issued by a railroad corporation (as defined in section 77(m) of the Bankruptcy Act, as amended) pursuant to a plan of reorganization under section 77 of the Bankruptcy Act.

[14] Sec. 302(c). CONSTRUCTIVE OWNERSHIP OF STOCK.—

(1) IN GENERAL.—Except as provided in paragraph (2) of this subsection, section 318(a) shall apply in determining the ownership of stock for purposes of this section.

[15] SEC. 318. CONSTRUCTIVE OWNERSHIP OF STOCK.

(a) GENERAL RULE.—For purposes of those provisions of this subchapter to which the rules contained in this section are expressly made applicable—

(1) MEMBERS OF FAMILY.—

(A) IN GENERAL.—An individual shall be considered as owning the stock owned, directly or indirectly, by or for—

(i) his spouse (other than a spouse who is legally separated from the individual under a decree of divorce or separate maintenance), and

(ii) his children, grandchildren, and parents.

(B) EFFECT OF ADOPTION.—For purposes of subparagraph (A)(ii), a legally adopted child of an individual shall be treated as a child of such individual by blood.

(2) PARTNERSHIPS, ESTATES, TRUSTS, AND CORPORATIONS.—

(A) PARTNERSHIPS AND ESTATES.—Stock owned, directly or indirectly, by or for a partnership or estate shall be considered as being owned proportionately by its partners or beneficiaries. Stock owned, directly or indirectly, by or for a partner or a beneficiary of an estate shall be considered as being owned by the partnership or estate.

(B) TRUSTS.—Stock owned, directly or indirectly by or for a trust shall be considered as being owned by its beneficiaries in proportion to the actuarial interest of

The reason for our conclusion with regard to the inapplicability of sections 302(b)(2) and 302(b)(3), as read in the light of section

such beneficiaries in such trust. Stock owned, directly or indirectly, by or for a beneficiary of a trust shall be considered as being owned by the trust, unless such beneficiary's interest in the trust is a remote contingent interest. For purposes of the preceding sentence, a contingent interest of a beneficiary in a trust shall be considered remote, if, under the maximum exercise of discretion by the trustee in favor of such beneficiary, the value of such interest, computed actuarially, is 5 percent or less of the value of the trust property. Stock owned, directly or indirectly, by or for any portion of a trust of which a person is considered the owner under subpart E of part I of subchapter J (relating to grantors and others treated as substantial owners) shall be considered as being owned by such person; and such trust shall be treated as owning the stock owned, directly or indirectly, by or for that person. This subparagraph shall not apply with respect to any employees' trust described in section 401(a) which is exempt from tax under section 501(a).

(C) CORPORATIONS.—If 50 percent or more in value of the stock in a corporation is owned, directly or indirectly, by or for any person, then—

(i) such person shall be considered as owning the stock owned, directly or indirectly, by or for that corporation, in that proportion which the value of the stock which such person so owns bears to the value of all the stock in such corporation; and

(ii) such corporation shall be considered as owning the stock owned, directly or indirectly, by or for that person.

(3) OPTIONS.—If any person has an option to acquire stock, such stock shall be considered as owned by such person. For purposes of this paragraph, an option to acquire such an option, and each one of a series of such options, shall be considered as an option to acquire such stock.

(4) CONSTRUCTIVE OWNERSHIP AS ACTUAL OWNERSHIP.—

(A) IN GENERAL.—Except as provided in subparagraph (B), stock constructively owned by a person by reason of the application of paragraph (1), (2), or (3) shall, for purposes of applying paragraph (1), (2), or (3), be treated as actually owned by such person.

(B) MEMBERS OF FAMILY.—Stock constructively owned by an individual by reason of the application of paragraph (1) shall not be treated as owned by him for purposes of again applying paragraph (1) in order to make another the constructive owner of such stock.

(C) OPTION RULE IN LIEU OF FAMILY RULE.—For purposes of this paragraph, if stock may be considered as owned by an individual under paragraph (1) or (3), it shall be considered as owned by him under paragraph (3).

[16] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(c) CONSTRUCTIVE OWNERSHIP OF STOCK.—

\* \* \* \* \* \* \*

(2) FOR DETERMINING TERMINATION OF INTEREST.—

(A) In the case of a distribution described in subsection (b)(3), section 318(a)(1) shall not apply if—

(i) immediately after the distribution the distributee has no interest in the corporation (including an interest as officer, director, or employee), other than an interest as a creditor,

(ii) the distributee does not acquire any such interest (other than stock acquired by bequest or inheritance) within 10 years from the date of such distribution, and

(iii) the distributee, at such time and in such manner as the Secretary or his delegate by regulations prescribes, files an agreement to notify the Secretary or his delegate of any acquisition described in clause (ii) and to retain such records as may be necessary for the application of this paragraph.

If the distributee acquires such an interest in the corporation (other than by bequest or inheritance) within 10 years from the date of the distribution, then the periods of limitation provided in sections 6501 and 6502 on the making of an assessment and the collection by levy or a proceeding in court shall, with respect to any deficiency (including interest and additions to the tax) resulting from such acquisition, include one year immediately following the date on which the distributee (in accordance with regulations prescribed by the Secretary or his delegate) notifies the Secretary or his delegate of such acquisition; and such assessment and collection may be made notwithstanding any provision of law or rule of law which otherwise would prevent such assessment and collection.

318(a)(1), is readily apparent upon examination of the stock ownership of Jewelry prior and subsequent to the redemption. On April 1, 1959 (prior to the redemption), the stock ownership of Jewelry was as follows:

| | Number of shares [1] | Percentage of ownership |
|---|---|---|
| Leon R. Meyer | 800 | 59. 26 |
| Lucile H. Meyer | 290 | 21. 48 |
| Jack Becker | 100 | 7. 41 |
| Richard C. Burstein | 100 | 7. 41 |
| Louis S. Meyer | 60 | 4. 44 |
| Total | 1, 350 | 100. 00 |

After the redemption, the stock ownership of Jewelry was as follows:

| | Number of shares [1] | Percentage of ownership |
|---|---|---|
| Leon R. Meyer | 800 | 75. 47 |
| Jack Becker | 100 | 9. 435 |
| Richard C. Burstein | 100 | 9. 435 |
| Louis S. Meyer | 60 | 5. 66 |
| Total | 1, 060 | 100. 00 |

[1] Includes ownership in both class A and class B shares which are deemed to be of the same and identical class as a result of an amendment of the special bylaws of the corporation at the stockholder meeting of Sept. 22, 1958.

Applying the rule of section 318(a)(1), ownership of Leon's (her husband) and Louis' (her son) stock in Jewelry is attributed to Lucile. Consequently, her percentage of ownership before and after the redemption was 85.18 and 81.13 percent, respectively. This percentage shift is not large enough to constitute a "substantially disproportionate redemption" under section 302(b)(2), the minimum of which must be 20 percent. Moreover, it is clear that there has not been a complete "termination of [Lucile's] interest" in Jewelry within the meaning of section 302(b)(3) and the statutory framework pertinent thereto.

Turning, then, to a consideration of section 302(b)(1) and a resolution of the question whether the distribution to Lucile was or was not "essentially equivalent to a dividend," it is appropriate to consider certain criteria which the courts have determined to be pertinent to this question. In *Thomas Kerr*, 38 T.C. 723, affd. 326 F. 2d 225, certiorari denied 377 U.S. 963, we discussed these criteria as follows (pp. 729–730):

It is recognized in the case law and in the regulations that the question whether a distribution is essentially equivalent to a dividend depends on the facts and circumstances of each case. *Earle* v. *Woodlaw*, 245 F. 2d 119 (C.A. 9, 1957), certiorari denied 354 U.S. 942 (1957); *Standard Linen Service, Inc.*, 33 T.C. 1 (1959); sec. 1.302–2(b), Income Tax Regs. Although the cases on this

point have failed to lay down a sole decisive test, *Flanagan* v. *Commissioner*, 116 F. 2d 937, 939 (C.A.D.C. 1940), affirming a Memorandum Opinion of this Court, they have established certain judicial criteria which have proven useful in determining the net effect of the distribution which, in actuality, is the fundamental question. *Flanagan* v. *Commissioner, supra; Genevra Heman*, 32 T.C. 479 (1959), affd. 283 F. 2d 227 (C.A. 8, 1960) ; *Ferro* v. *Commissioner*, 242 F. 2d 838 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court; and *John A. Decker*, 32 T.C. 326, 330 (1959), affirmed per curiam 286 F. 2d 427 (C.A. 6, 1960).

Among these criteria are: Did the corporation adopt any plan of contraction of its business activities; did the transaction actually result in a contraction of the corporation business; did the initiative for the corporate distribution come from the corporation or the shareholders; was the proportionate ownership of stock by the shareholders changed; what were the amounts, frequency, and significance of dividends in the past; was there a sufficient accumulation of earned surplus to cover distribution or was it partly from capital; and was there a bona fide corporate business purpose for the distribution? *Flanagan* v. *Commissioner, supra; Earle* v. *Woodlaw, supra;* and *Genevra Heman, supra.* It is to be noted that while these criteria materialized for the most part in cases construing section 115(g) of the Internal Revenue Code of 1939, Congress has expressed a desire that they be made applicable to cases arising under section 302(b)(1) as well. S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d sess., pp. 233, 234 (1954).

In the instant case Jewelry did not have any plan to contract its business, the transaction did not result in any contraction of its business, the initiative for the corporate distribution did not come from the corporation but came from the stockholders, there had been no dividends in the past, and there was no bona fide corporate business purpose for the distribution.

In considering as a criterion in the application of section 302(b)(1) the question of whether the transaction resulted in a change in the proportionate ownership of stock by the shareholders or, as it is referred to in *Estate of Arthur H. Squier*, 35 T.C. 950, 956, "a substantial dislocation of relative stockholdings in the corporation," we must give effect to the constructive ownership rules of section 318(a). *Thomas G. Lewis, supra.* By so doing, it appears that Lucile's proportionate stock ownership was 85.18 percent before the distribution and redemption and 81.13 percent thereafter. In our opinion, this decrease did not constitute "a substantial dislocation of relative stockholdings" in Jewelry. Moreover, in this case there is no suggestion of a change in control or of any "sharp cleavage" between the members of the Meyer family, which might tend to diminish the significance of the attribution rules of section 318(a)(1) as a factor in the consideration of whether a redemption is "not essentially equivalent to a dividend" under section 302(b)(1). Cf. *Estate of Arthur H. Squier, supra.* To the contrary, an examination of the record herein discloses an almost touching picture of family affection, trust, and cooperation.

Thus, all of the criteria available for our guidance on this subject [17] (with the exception of the availability of earnings and profits of Jewelry from which dividends could be paid, a matter hereinafter to be discussed) point to a conclusion that the payments made by Jewelry to Lucile as steps in the redemption of her stock were essentially equivalent to a dividend, and we so hold subject to our resolution of several troublesome problems pertaining to the availability of earnings and profits from which a dividend distribution could be made.

The net effect of the transaction (see *Flanagan v. Helvering*, 116 F. 2d 937) was the distribution to Lucile by a corporation controlled by her and her husband, Leon, of a considerable part of the proceeds realized by the corporation from the sale of securities contributed by Leon (after they had greatly appreciated in market value since he purchased them) to the corporation which at that time was entitled to a large operating loss carryover, without any substantial dislocation of the relative stockholdings or of any diminution in the control over the corporation by the closely knit Meyer family, and without a "significant modification of shareholder interests."[18]

We now turn to a consideration of the question whether there was "a sufficient accumulation of earned surplus to cover [the] distribution."

Because we have concluded that the distributions to Lucile were made in Jewelry's fiscal year ended June 30, 1960, as a part of the redemption of her stock in that fiscal year, we must consider whether there were sufficient earnings and profits available at that time to support respondent's determination that these distributions were dividends.

In this connection the principal question is what effect the cancellation of indebtedness of Jewelry under a chapter XI arrangement under the Bankruptcy Act confirmed on July 3, 1956, had on its earnings and profits account.

Petitioners argue that the effects of the chapter XI proceeding which canceled indebtedness in the amount of $189,785.42 were to produce a zero balance in the earnings and profits account of Jewelry and create a "Contributed capital" account in the amount of $179,746.36,[19] on the ground that the cancellation of indebtedness pursuant to the chapter XI bankruptcy did not result in any increase in the earnings and profits account, but rather that such cancellation should produce a credit in the above-mentioned amount to "Contributed capital."

Respondent argues that because the cancellation of indebtedness had the effect of freeing certain assets from the encumbrance of lia-

---

[17] Including the three deemed pertinent in *J. Milton Sorem*, 40 T.C. 206, 220 (Judge Dawson dissenting), revd. 334 F. 2d 275.

[18] See Moore, "Dividend Equivalency—Taxation of Dividends in Redemption of Stock," 19 Tax L. Rev. 249, 252.

[19] See fn. 4, *supra*.

bilities, this fact must be reflected in the earnings and profits account of Jewelry. His position, as summarized on brief, is as follows:

Since the earnings and profits account was decreased when the debts were incurred, the entries made at the time of the deduction should be corrected by restoring to earnings and profits the amount of debts forgiven in the arrangement proceeding in order to reflect the correct accumulated earnings and profits of the corporation.

The resolution of this problem is crucial to a characterization of the distributions received by Lucile, because if we follow petitioners' contentions with respect to the cancellation of indebtedness issue, there would have been earnings and profits available to Jewelry in the fiscal year ended June 30, 1960, only to the extent of its current earnings of that year in the amount of $2,117.13.

Petitioners' argument proceeds along the following lines: that both the relevant sections of the Bankruptcy Act [20] and respondent's own regulations [21] provide that no income shall be realized in connection with a cancellation of indebtedness pursuant to a bankruptcy proceeding. Petitioners maintain that the proper treatment of such cancellation would be either to create a "Contributed capital" account in such amount or to set off the deficit existing prior to the chapter XI proceeding and carry the excess in a capital surplus account.

---

[20] 11 U.S.C. sec. 795. Taxes; income or profit from modification of indebtedness.

Except as provided in section 796 of this title, no income or profit, taxable under any law of the United States or of any State now in force or which may hereafter by enacted, shall, in respect to the adjustment of the indebtedness of a debtor in a proceeding under this chapter, be deemed to have accrued to or to have been realized by a debtor or a corporation organized or made use of for effectuating an arrangement under this chapter by reason of a modification in or cancellation in whole or in part of any such indebtedness in a proceeding under this chapter: *Provided, however,* That if it shall be made to appear that the arrangement had for one of its principal purposes the evasion of any income tax, the exemption provided by this section shall be disallowed. * * *

\*        \*        \*        \*        \*        \*        \*

Sec. 796. Same; income tax; property basis adjustment.

In determining the basis of property for any purposes of any law of the United States or of a State imposing a tax upon income, the basis of the debtor's property (other than money) or of such property (other than money) as is transferred to any person required to use the debtor's basis in whole or in part shall be decreased by an amount equal to the amount by which the indebtedness of the debtor, not including accrued interest unpaid and not resulting in a tax benefit on any income-tax return, has been canceled or reduced in a proceeding under this chapter, but the basis of any particular property shall not be decreased to an amount less than the fair market value of such property as of the date of entry of the order confirming the arrangement. Any determination of value in a proceeding under this chapter shall not be deemed a determination of fair market value for the purposes of this section. The Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, shall prescribe such regulations as he may deem necessary in order to reflect such decrease in basis for Federal income-tax purposes and otherwise carry into effect the purposes of this section. * * *

[21] Sec. 1.61–12   Income from discharge of indebtedness.

(b) *Proceedings Under Bankruptcy Act.* (1) Income is not realized by a taxpayer by virtue of the discharge, under section 14 of the Bankruptcy Act (11 U.S.C. 32), of his indebtedness as the result of an adjudication in bankruptcy or by virtue of an agreement among his creditors not consummated under any provision of the Bankruptcy Act, if immediately thereafter the taxpayer's liabilities exceed the value of his assets. Furthermore, unless one of the principal purposes of seeking a confirmation under the Bank-

Petitioners contend that two items, the $7,500 payment to the Jewelers Board of Trade and an alleged $2,539.06 payment for estimated tax and administrative expenses, should be deducted from the total amount of debts discharged, $189,785.42. Petitioners therefore argue that $179,746.36 is the correct amount to be reflected on the corporate balance sheet. Respondent, on the other hand, questions the propriety of these deductions and urges that the $189,785.42 figure be used.[22] However, it appears to us unnecessary to decide this question since it will be seen from our resolution of the issue as to whether there were sufficient earnings and profits to support the $31,328.17 distribution to Lucile, that even if we were to reduce the cancellation of indebtedness figure by the total amount of the deductions herein at issue, $10,039.06, the result would be the same.

The precise question which we face is whether the cancellation of corporate indebtedness pursuant to a chapter XI proceeding may, in whole or in part, be considered as generating earnings and profits. While the Bankruptcy Act (11 U.S.C. secs. 795, 796) and section 1.61–12(b), Income Tax Regs., provide that such cancellation is exempt from the Federal corporate income tax, despite the provisions of section 61(a)(12), they are silent with regard to the effect of such a transaction upon the "earnings and profits" of the debtor corporation.

However, both 11 U.S.C. sec. 796, and section 1.61–12(b)(2), Income Tax Regs., deal with adjustment of basis, the latter containing a reference to the regulations under section 1016. The pertinent regulation under this section is section 1.1016–7, Income Tax Regs.,[23]

---

ruptcy Act is the avoidance of income tax, income is not realized by a taxpayer in the case of a cancellation or reduction of his indebtedness under—

(i) A plan of corporate reorganization confirmed under Chapter X of the Bankruptcy Act (11 U.S.C., ch. 10);

(ii) An "arrangement" or a "real property arrangement" confirmed under Chapter XI or XII, respectively, of the Bankruptcy Act (11 U.S.C., ch. 11, 12); or

(iii) A "wage earner's plan" confirmed under Chapter XIII of the Bankruptcy Act (11 U.S.C., ch. 13).

(2) For adjustment of basis of certain property in the case of cancellation or reduction of indebtedness resulting from a proceeding under the Bankruptcy Act, see the regulations under section 1016.

[22] While the record supports the petitioner with respect to the fact of the $7,500 payment, there is no indication that the tax and administrative expenses in connection with the chapter XI proceeding were in the amount of $2,539.06. Even if we were to assume that both payments were in fact made, it is extremely doubtful whether there is justification for deducting them from the amount of the debts discharged and considering such deductions in any computations we might make with regard to the earnings and profits of Jewelry. The income statement for the year ended June 30, 1956, contains expense entries for "Taxes" and "Miscellaneous" in the respective amounts of $6,910.15 and $8,678.58. If, as we believe, petitioners have the burden of proof on this issue, they have not borne the burden of proving that these items were not reflected in the corporate income statement as of June 30, 1956.

[23] Sec. 1.1016–7 Adjusted basis; cancellation of indebtedness under Bankruptcy Act.

(a) In addition to the adjustments provided in section 1016, further adjustment is required in the case of a cancellation or reduction of indebtedness in any proceeding under chapters X, XI, or XII of the Bankruptcy Act (11 U.S.C. ch. 10, 11, and 12) and corre-

dealing with certain required adjustments to basis "in the case of a cancellation or reduction of indebtedness in any proceeding under chapters X, XI, or XII of the Bankruptcy Act." This regulation establishes a priority system for the reduction of the bases of assets of a bankrupt, in the total amount of any indebtedness which is canceled or reduced in the bankruptcy proceeding. However, both the bankruptcy statute and the regulation further provide that no asset's basis shall be reduced below its fair market value as of the date of entry of the order confirming the plan of bankruptcy.

sponding provisions of prior law. For exceptions to the above rule see sections 372, 373, 374, and 1018. Furthermore, no such further adjustment will be made in the case of a "wage earner" as that term is defined in section 606(8) of the Bankruptcy Act (11 U.S.C. 1006(8)). The further adjustments required by this section shall be made in the following manner and order :

(1) In the case of indebtedness incurred to purchase specific property (other than inventory or notes or accounts receivable whether or not a lien is placed against such property securing the payment of all or part of such indebtedness, which indebtedness shall have been canceled or reduced in any such proceeding, the cost or other basis of such property shall be decreased (but not below its fair market value) by the amount by which the indebtedness so incurred with respect to such property shall have been canceled or reduced ;

(2) In the case of specific property (other than inventory or notes or accounts receivable) against which, at the time of the cancellation or reduction of the indebtedness, there is a lien (other than a lien securing indebtedness incurred to purchase such property) the cost or other basis of such property shall be decreased (but not below its fair market value) by the amount by which the indebtedness secured by such lien shall have been canceled or reduced ;

(3) Any excess of the total amount by which the indebtedness shall have been so canceled or reduced in such proceeding over the sum of the adjustments made under subparagraphs (1) and (2) of this paragraph shall next be applied to reduce the cost or other basis of the property of the debtor (other than inventory and notes and accounts receivable, but including property covered by such subparagraphs) as follows : the cost or other basis of each unit of property shall be decreased (but not below its fair market value) in an amount equal to such proportion of such excess as the adjusted basis (after adjustment under subparagraphs (1) and (2) of this paragraph) of each such unit of property bears to the sum of the adjusted bases (after adjustment under such subparagraphs) of all the property of the debtor other than inventory and notes and accounts receivable ;

(4) Any excess of the total amount by which such indebtedness shall have been so canceled or reduced over the sum of the adjustments made under subparagraphs (1), (2), and (3), of this paragraph shall next be applied to reduce the cost or other basis of any units of property covered by such subparagraphs which have a remaining basis (after adjustment under such subparagraphs) greater than their fair market value, as follows : the cost or other basis of each such unit of property shall be decreased (but not below its fair market value) in an amount equal to such proportion of such excess as the remaining basis of each such unit bears to the sum of the remaining bases of such units. The process shall be repeated until the cost or other basis of each unit of the property covered by subparagraphs (1), (2), and (3), of this paragraph is reduced to its fair market value or the amount by which the indebtedness shall have been canceled or reduced is exhausted, taking into account in the successive steps only those units of property having, after the preceding adjustment, a remaining basis greater than their fair market value; and

(5) Any excess of the total amount by which the indebtedness shall have been so canceled or reduced over the sum of the adjustments made under subparagraphs (1), (2), (3), and (4) of this paragraph shall next be applied to reduce the cost or other basis of inventory and notes and accounts receivable as follows : the cost or other basis of inventory or notes or accounts receivable, as the case may be, shall be decreased (but not below its fair market value) in an amount equal to such proportion of such excess as the adjusted basis of inventory, notes receivable or accounts receivable, as the case may be, bears to the sum of the adjusted bases of such inventory and notes and accounts receivable. The process shall be repeated until the adjusted bases of inventory, notes receivable, and accounts receivable are reduced to their fair market value or the amount by which the indebtedness shall have been

Exhibits submitted by the petitioners and oral testimony establish the fact that on June 30, 1956, 3 days prior to the formal approval of the bankruptcy arrangement, the inventory and fixed assets were written down in the amount of $64,000, and the accounts and notes receivable were similarly adjusted downward in the net amount of $10,886.84 to reflect the fair market value of these assets. Although this write-down in the total amount of $74,886.84 was executed 3 days prior to the formal entry of the bankruptcy order, we believe that it was done in anticipation of that order, and may be considered by us as fixing the fair market value of the assets of Jewelry as of the time of the forgiveness of its indebtedness pursuant to the bankruptcy proceedings at their book value, minus the total amount of such write-downs.

It is significant that the regulations provide for such a reduction of basis, for the effect of such a rule is to defer recognition of any gain realized upon the cancellation of indebtedness until the property with the reduced basis is sold or otherwise disposed of. *Bangor and Aroostook Railroad Co.*, 16 T.C. 578, 582–586, affd. 193 F. 2d 827. Although the *Bangor* case dealt with section 22(b)(9) of the 1939 Code (the predecessor of sec. 108 of the 1954 Code), we feel that the relationship it describes between the concepts of "basis" and "earnings and profits" is a fundamental one. See also *Kentucky Farm & Cattle Co.*, 30 T.C. 1355, 1367. Because section 1.1016–7(a), Income Tax Regs., speaks of "required" reductions in basis, we conclude that the gain occasioned by cancellation of a bankrupt's indebtedness to the extent that it reduces the basis of the debtor's assets is not permanently relieved of taxation, but the time for such taxation is merely postponed to a subsequent transaction in which the resulting gain or

canceled or reduced is exhausted, taking into account in the successive steps only those units of property having, after the preceding adjustment, a remaining basis greater than their fair market value.

(b) For the purposes of this section :

(1) Basis shall be determined as of the dates of entry of the order confirming the plan, composition, or arrangement under which such indebtedness shall have been canceled or reduced ;

(2) Except where the context otherwise requires, property means all of the debtor's property, other than money ;

(3) No adjustment shall be made by virtue of the cancellation or reduction of any accrued interest unpaid which shall not have resulted in a tax benefit in any income tax return ;

(4) The phrase "indebtedness incurred to purchase" includes (i) indebtedness for money borrowed and applied in the purchase of property and (ii) an existing indebtedness secured by a lien against the property which the debtor, as purchaser of such property, has assumed to pay ; and

(5) The term "fair market value" has reference to such value as of the date of entry of the order confirming the plan, composition, or arrangement under which such indebtedness shall have been canceled or reduced.

(c) Any determination of value in a proceeding under the Bankruptcy Act (11 U.S.C. 1 et seq.), shall not constitute a determination of fair market value for the purpose of this section.

(d) The basis of any of the debtor's property which shall have been transferred to a person required to use the debtor's basis in whole or in part shall be determined in accordance with the provisions of this section.

loss is recognized for income tax purposes. It is at the time of the subsequent transaction that the resulting gain or loss, if any, will affect the earnings and profits of the debtor corporation.

In view of this postponement in the recognition of gain, we choose to follow the reasoning in the *Bangor* opinion with respect to the effect of a forgiveness of indebtedness to the extent it affects the basis of the debtor's assets upon earnings and profits of the debtor in the year of the forgiveness. In that case, the Court held that although section 115(1) of the 1939 Code [24] was not literally applicable to a discharge of corporate indebtedness to be accompanied by a corresponding decrease in the basis of corporate assets, it "gave expression to a concept of 'earnings and profits' that was already widely recognized and which inheres in the meaning of those words." *Bangor and Aroostook Railroad Co., supra* at 584. On pages 585 and 586 of our opinion in that case we made the following statements which are helpful in our consideration of the case before us:

The present case must be distinguished from situations where fully realized income which is exempt from tax, such as interest on state bonds, is included in earnings and profits. See Treasury Regulations 111, section 29.115–3. Although the general introductory language of section 22(b) of the Code characterizes the various types of income in the subdivisions to follow as "exempt," the fact is that, under the specific provisions of section 22(b)(9), the income from discharge of indebtedness escapes taxation only by reason of the option in

[24] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(1) EFFECT ON EARNINGS AND PROFITS OF GAIN OR LOSS AND OF RECEIPT OF TAX-FREE DISTRIBUTIONS.—The gain or loss realized from the sale or other disposition (after February 28, 1913) of property by a corporation—

(1) for the purpose of the computation of earnings and profits of the corporation, shall be determined, except as provided in paragraph (2), by using as the adjusted basis the adjusted basis (under the law applicable to the year in which the sale or other disposition was made) for determining gain, except that no regard shall be had to the value of the property as of March 1, 1913; but

(2) for the purpose of the computation of earnings and profits of the corporation for any period beginning after February 28, 1913, shall be determined by using as the adjusted basis the adjusted basis (under the law applicable to the year in which the sale or other disposition was made) for determining gain.

Gain or loss so realized shall increase or decrease the earnings and profits to, but not beyond, the extent to which such a realized gain or loss was recognized in computing net income under the law applicable to the year in which such sale or disposition was made. Where in determining the adjusted basis used in computing such realized gain or loss the adjustment to the basis differs from the adjustment proper for the purpose of determining earnings or profits, then the latter adjustment shall be used in determining the increase or decrease above provided. For the purposes of this subsection, a loss with respect to which a deduction is disallowed under section 118, or a corresponding provision of a prior income-tax law, shall not be deemed to be recognized. Where a corporation receives (after February 28, 1913) a distribution from a second corporation which (under the law applicable to the year in which the distribution was made) was not a taxable dividend to the shareholders of the second corporation, the amount of such distribution shall not increase the earnings and profits of the first corporation in the following cases:

(1) No such increase shall be made in respect of the part of such distribution which (under such law) is directly applied in reduction of the basis of the stock in respect of which the distribution was made.

(2) No such increase shall be made if (under such law) the distribution causes the basis of the stock in respect of which the distribution was made to be allocated between such stock and the property received.

section 22(b)(9), and the effect of exercise of the option is not a complete withdrawal or insulation of the profit from tax. Unlike other exclusions from income provided for by section 22(b), the profit from discharge of indebtedness is excluded only in the condition that it be applied in reduction of the basis of property held by the petitioner. Sections 22(b)(9), 113(b)(3), Internal Revenue Code. In reality, by providing for an adjustment altering the basis of property which petitioner would otherwise be entitled to use. Congress did not relieve the profit of tax but only postponed the time for levying the tax.[5] Instead of collecting a tax on the profit when received, Congress merely deferred recognition of the profit and collection of the tax until the time at which the property with the reduced basis was sold or otherwise disposed of.[6] See *Commissioner* v. *Jacobson*, 336 U.S. 28, 44–46.

This method of treating the profit is comparable to the treatment accorded nontaxable exchanges governed by the so-called reorganization provisions in section 112 of the Code, where recognition is similarly postponed. In both situations, the earnings and profits are affected, not at the time of the original unrecognized transaction, but at the time that the gains or losses are actually taken into account in computing taxable income. True, the result with respect to section 112 transactions, dealing with sales and exchanges, is specifically called for by section 115(1),[7] but, as we have seen, section 115(1) was merely declaratory of existing law in this regard, and the same result is required by a proper interpretation of the term "earnings and profits." [Footnotes omitted.]

Respondent calls our attention to section 1.312–6(b), Income Tax Regs. This provision states:

Among the items entering into the computation of corporate earnings and profits for a particular period are all income exempted by statute, income not taxable by the Federal Government under the Constitution, as well as all items includible in gross income under section 61 or corresponding provisions of prior revenue acts. Gains and losses within the purview of section 1002 or corresponding provisions of prior revenue acts are brought into the earnings and profits at the time and to the extent such gains and losses are recognized under that section. Interest on State bonds and certain other obligations, although not taxable when received by a corporation, is taxable to the same extent as other dividends when distributed to shareholders in the form of dividends.

Respondent contends that petitioners' position is squarely opposed to the above regulation. Although income from discharge of indebtedness is included in the definition of gross income by section 61(a)(12) of the 1954 Code,[25] it is our opinion that it is not realized at the time of the discharge by virtue of the relevant provisions of the Bankruptcy Act because of and only to the extent of its use in the reduction of the basis of the debtor's assets, and further, that to the extent it was not so used, it is fully realized income even though exempt from tax, such as interest on State bonds and proceeds from life insurance, which

[25] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

* * * * * * *

(12) Income from discharge of indebtedness;

are included in earnings and profits. *Bangor and Aroostook Railroad Co., supra* at 585. To the extent of such use the discharge of indebtedness, although reducing the liabilities of the debtor corporation, simultaneously reduces the basis of its assets in an equal amount, and therefore has no net effect on its balance sheet. We are therefore convinced that section 1.312–6(b), Income Tax Regs., is not applicable in the instant case to that part of the discharge of the indebtedness which can be used in the reduction of the basis of the debtor's assets and hold that to the extent that the basis of a bankrupt's assets can be reduced by reason of a cancellation of indebtedness under section 1.1016–7, Income Tax Regs., any such cancellation of indebtedness made pursuant to a bankruptcy proceeding should not, to the extent indicated, increase earnings and profits.

However, in the instant case the book value of Jewelry's assets was written down in the amount of $74,886.84 to reflect a fair market value of the total assets, at or about the time of the cancellation, in the total amount of $325,400.04, while the total cancellation of indebtedness was $189,785.42. No further reduction of basis is allowable under 11 U.S.C. sec. 796, and section 1.1016–7, Income Tax Regs., because the record indicates that the $325,400.04 figure represented the fair market value of Jewelry's assets as of the time of the chapter XI proceeding. While the Internal Revenue Code, respondent's regulations, and the Bankruptcy Act [26] make no specific provision as to the proper treatment of the excess of discharged indebtedness over the amount of allowable basis reduction, we feel that in light of the general provision of section 61(a)(12) and the reasoning of the Court in *Bangor and Aroostook Railroad Co., supra*, such excess is realized income merely exempt from corporate taxation. Therefore, we conclude that this excess must be included in the earnings and profits account. As such the rule as stated in section 1.312–6(b), Income Tax Regs., would apply to this excess amount.

We cannot accept petitioners' argument that the amount of discharged indebtedness or any part thereof be placed in a "Contributed capital" account. Since the creditors whose debts were discharged were not shareholders of Jewelry and had no intention of making any investment in Jewelry, it appears obvious to us that the discharge of the

---

[26] The legislative history of the pertinent sections of the Bankruptcy Act indicates that the intention of Congress was to provide exemption from taxation of the income received in such a situation, conditioned on an equivalent basis reduction which would result in the realization of income from a later sale or exchange of such assets if they were sold or exchanged at a price in excess of their reduced basis. See S. Rept. No. 1916, 75th Cong., 3d Sess., p. 39.

debts owing to them cannot be considered as "Contributed capital." See sec. 1.61–12(a), Income Tax Regs.[27]

Petitioners' exhibits indicate the fact that on Jewelry's income statement for the fiscal year ended June 30, 1956, the $64,000 inventory write-down was carried into the "Cost of Sales" account. Moreover, a total amount of $18,106.01 was noted in the income statement under "Expenses: Bad debts." With regard to this latter item, we have already found that this figure represents the two debits of $10,886.84 and $7,219.17 to "Bad debt expense" and "Bad debt reserve," respectively. Our explanation of the nature of the 1956 debit to the bad debt reserve in the amount of $7,219.17 contained in our findings, footnote 6, *supra*, concluded that such an item cannot represent an asset write-down. It is obvious that such a reduction in a bad debt reserve cannot constitute a bad debt expense, since such a reserve represents estimates of uncollectible accounts and not actual accounts shown to be uncollectible. If anything, a reduction in a bad debt reserve would indicate that certain accounts believed to be uncollectible proved collectible in the amount of the reduction. We therefore find that the expenses for the year ended June 30, 1956, were overstated in the amount of $7,219.17, and our computations reflect this holding.

The remaining question for our consideration with regard to the earnings and profits of Jewelry is whether the $64,000 inventory write-down and the $10,886.84 ($18,106.01 − $7,219.17) accounts or notes receivable write-down to fair market value made pursuant to the chapter XI arrangement can still be regarded as expenses (as petitioners contend) for the year ended June 30, 1956, in view of our holding that such write-downs must be reflected in the appropriate assets and liabilities accounts. While these write-downs might be regarded as expenses from an accounting standpoint, our resolution of the problem prevents these write-downs from entering into the profit and loss computations for this year, for to do so in combination with our holding that they must serve to reduce the amount of discharged liabilities which would otherwise have been included in earnings and profits would give them double effect on such earnings and profits. The reason for this is apparent upon comparison of petitioners' contentions with respect to the balance sheet effects of the bankruptcy and our own.

Petitioners argue that the proper balance sheet treatment of these events is to create an account designated "Contributed capital" in the

---

[27] Sec. 1.61–12 Income from discharge of indebtedness.

(a) *In general.* The discharge of indebtedness, in whole or in part, may result in the realization of income. If, for example, an individual performs services for a creditor, who in consideration thereof cancels the debt, the debtor realizes income in the amount of the debt as compensation for his services. A taxpayer may realize income by the payment or purchase of his obligations at less than their face value. In general, if a shareholder in a corporation which is indebted to him gratuitously forgives the debt, the transaction amounts to a contribution to the capital of the corporation to the extent of the principal of the debt.

total approximate amount of the discharged debts and reduce the "Liabilities" account by the same amount. Since this operation merely involves a change of classification on the right side of the balance sheet, both the left and right sides thereon would still be "in balance." However, petitioners have reduced the figures at which various assets were carried on the left side of the balance sheet by $74,886.84, the total amounts of the alleged write-down of the assets to their fair market values. In order to compensate for this reduction on the "assets" side of the balance sheet, petitioners have regarded these write-downs as expenses for the year ended June 30, 1956. By designating these write-downs as expenses, petitioners have increased the loss for the year ended June 30, 1956, and consequently have decreased the earnings and profits account.

Our resolution of this issue has rejected the creation of a "Contributed capital" account in the amount of the discharged debts. We have held that the excess of the amount of discharged debts over the allowable basis reductions should be placed in the earnings and profits account. We have therefore effected the following operations upon the balance sheet: A reduction on the left (assets) side by the amount of allowable basis write-downs, a reduction on the right side (the liability account) by the amount of the discharged debts, and an increase on the right side of the earnings and profits account in the amount by which the discharged debts exceed the allowable basis reductions. These three steps leave the accounts "in balance." While this conclusion has the result of decreasing the amounts of "expenses" and loss for the year ended June 30, 1956, as used by petitioners in their computations on brief by $74,886.84 with a consequent decrease in the deficit of Jewelry's earnings and profits in the same amount, it has no material effect [28] on the computations which, in our opinion, are properly to be made on the basic premise, as stated above, of including in earnings and profits that part of the discharged indebtedness not used in a reduction of the bases of the debtor's assets.[29]

We therefore conclude that the net loss and the deficit as reported for this year were overstated in the amount of $82,106.01 ($74,886.84 +$7,219.17). Since Jewelry's income statement indicates that the defi-

---

[28] This is not the case with regard to the $7,219.17, which we found to be an improperly taken expense. Since it is neither an expense nor a reduction of the basis of assets, we have subtracted this amount from the expenses for the year ended June 30, 1956. This subtraction has the effect of increasing both income for the year ended June 30, 1956, and existing earnings and profits as of that date.

[29] Whether the $74,886.84 is employed as a basis reduction and offsets the amount of discharged debts otherwise includable in earnings and profits ($189,785.42−$74,886.84), or whether it is regarded as an expense for the fiscal year ended June 30, 1956, thereby increasing the deficit in earnings and profits as of June 30, 1956, with no offset effected upon the total amount of discharged debts includable in earnings and profits (−$74,886.84 +$189,785.42), the effect upon the computation of the earnings and profits is exactly the same.

cit as of June 30, 1956, was ($111,392.14),[30] the adjustment as outlined above would result in a deficit figure of ($29,286.13) for the earnings and profits account as of June 30, 1956.

As we have stated, we hold that the excess of discharged indebtedness over total allowable basis deductions should increase earnings and profits. This excess *is* computed as follows:

$189,785.42 _____ Discharged indebtedness
74,886.84 _____ Allowable basis deductions
_____
114,898.58

Since the prebankruptcy deficit does survive the chapter XI proceeding, *El Pomar Investment Co.* v. *United States*, 210 F. Supp. 333, affd. 330 F. 2d 872, and is not canceled as petitioner contends,[31] a computation of the earnings and profits of Jewelry up to the time of the distribution to Lucile would be as follows:

Deficit as of June 30, 1956_____ ($29,286.13)
Amount of discharge of indebtedness income includable in earnings and profits as of July 3, 1956_____ 114,898.58
Loss from operations, fiscal year ending June 30, 1957___ (16,147.89)
Loss from operations, fiscal year ending June 30, 1958___ (69,941.20)
Gain from operations, fiscal year ending June 30, 1959___ [1] 65,997.38
Nondeductible contributions (June 30, 1957–June 30, 1959) _____ (1,464.53)
_____
64,056.21
Less: Disallowed excess of charitable deductions above 5 percent of taxable income, fiscal year ending June 30—[2]
1957 _____ $452.50
1958 _____ 587.03
1959 _____ 425.00
_____
1,464.53
Earnings and profits as of July 1, 1959_____ 62,591.68

[1] After reduction of $9.72 for dividend distribution to Leon. See our discussion, *infra*.
[2] Excess charitable contributions not deducted in computing taxable income because of the 5-percent ceiling should reduce earnings and profits. See sec. 1.312–7(b)(1), Income Tax Regs.

Because Jewelry's income tax return indicates that there was income during the fiscal year ended June 30, 1960, in the amount of $2,492.13, and disallowed charitable contributions in the amount of $375 due to the 5-percent rule, it is apparent that there were more than sufficient earnings and profits of Jewelry in that year to cover the $31,328.17 distribution to Lucile. Hence, we reiterate our holding that such dis-

[30] This figure includes subtractions for charitable contributions of $1,090.88 and $780 made in the years ended June 30, 1955, and June 30, 1956, and disallowed because of the 5-percent-limitation rule of sec. 170(b)(2).
[31] Cf. *Dunning* v. *United States*, 353 F. 2d 940, affirming 232 F. Supp. 915, where all the old capital stock was wiped out pursuant to a sec. 77B bankruptcy proceeding.

tribution was a dividend within the meaning of section 316(a) of the Internal Revenue Code of 1954.

The record indicates that the difference of $2,328.17 between the total of the payments to Lucile ($31,328.17) and the $29,000 credited to her account in connection with the redemption of her stock continued to be carried in her account with Jewelry as a receivable. This ledger account showed a debit balance of not less than $2,472.89 as of December 31, 1959, and not more than $2,623.86, the latter figure representing the balance as of May 25, 1961, the date of the last entry therein.

As we have noted in our findings, *supra*, these amounts were not represented by notes, did not bear any interest in favor of Jewelry, were not payable at any fixed maturity date, and were not secured in any manner by any of Lucile's assets once the redemption price for her stock was fixed at its par value, $29,000. Lucile has never repaid to Jewelry the balance of $2,328.17, and petitioners have made no attempt to contend that the $2,328.17 was a bona fide debt of Lucile's to the corporation. In the light of all the above-mentioned factors, we conclude that the entire amount received by Lucile ($31,328.17) is taxable to her as a dividend. *Atlanta Biltmore Hotel Corp.* v. *Commissioner*, 349 F. 2d 677, affirming a Memorandum Opinion of this Court; *Jacob M. Kaplan*, 43 T.C. 580, 595.

Petitioners further argue that in any event the redemption of Lucile's stock is not essentially equivalent to a dividend to the extent of $25,000 under the terms of section 302(b)(1). Petitioners base this contention on the theory that $25,000 of the $31,328.17, which Lucile received from Jewelry, represented no more than the ultimate repayment of the $25,000 liability to Lucile which the corporation incurred in 1946 in the form of five 10-year notes of $5,000 each. These notes were issued to Lucile as part of the consideration paid to her at the time the partnership known as Meyer Jewelry Co. assumed corporate form. In support of this argument, petitioners call our attention to *Keefe* v. *Cote*, 213 F. 2d 651, and *Estate of Henry A. Golwynne*, 26 T.C. 1209.

Petitioners attempt to bring the instant situation within the rule of the above cases on the ground that the $50,000 of liabilities which Jewelry incurred to Leon and Lucile in 1946 were capitalized into 500 shares of class B stock in 1947 only to improve the balance sheet of the corporation so as to obtain a more favorable credit rating. They argue that the liability was still regarded as remaining outstanding and as such, $25,000 of the total amount paid to Lucile during the year 1959 represented repayment of this debt.

We neither agree with petitioners' analysis of the transaction nor do we believe that either of the two cases supports petitioners' position.

The notes were converted into 500 shares of class B stock in 1947, a year after the corporation was organized. The $100 par class B stock carried with it the right to vote and a $6 per share noncumulative dividend preference. It could have been redeemed "at the option of the Board of Directors at any time at the par value thereof." In spite of this recital in the amendment to the articles of incorporation, there is nothing in the record which would suggest that this $50,000 "investment" was ever treated in any manner other than that of ordinary equity capital.

While the interest may have been paid on the five notes totaling $25,000 due Leon up until their conversion into class B stock, there is no similar indication that any interest was ever paid to Lucile.[32] No amounts were ever repaid either on the notes or in redemption of the class B stock throughout the period 1946 through 1958. Moreover, there is no evidence that any preference dividends were paid on the class B shares during the period 1947 through 1958. On September 22, 1958, all of the class A and class B stockholders of Jewelry voted to remove the alleged preferences which attached to the class B shares and to make the class A and B shares "of the same and identical class." After maintenance of the separate class B stock for 11 years without any corporate action tending to recognize the $50,000 "investment," either as a debt or as preferred stock, the class B shares were rendered indistinguishable from the ordinary common stock of Jewelry.

Given the complete failure of Jewelry to adhere to the terms of the notes or to the 250 class B shares held by Lucile by making any payments thereon for such a long period of time, the failure of Lucile to make any demands for such payments, the absence of any agreement, either explicit or implicit, that the class B shares would be redeemed when Jewelry was financially able to do so, the fact that Lucile was a 50-percent stockholder in Jewelry and participated in its management during the period 1946 to 1959, the ultimate obliteration of the class B distinction in the capital structure of the corporation, the fact that the distributions to Lucile were treated by all of the parties as in redemption of all of Lucile's stock without reference to any part of such stock taken by her 11 years prior thereto in exchange for her notes, and the testimony of Lucile and Leon concerning the motives prompting the distributions to Lucile which made no reference to the repayment of any debt but which as we construe it was to the effect that the distributions to Lucile in redemption of her

[32] The five notes of Leon's, photostatic copies of which were admitted in evidence, all bear the notation on the reverse side: "Interest to and including Sept. 30, 1947/ Received/ Leon R. Meyer/ Pay to order of/ Meyer Jewelry Co./ Leon R. Meyer/ Canceled 9/30/47/ Meyer Jewelry Co./ By ‗‗‗‗‗‗‗‗‗‗‗‗‗‗." The five notes of Lucile, photostatic copies of which were also admitted in evidence, merely bear the notation on the reverse side: "Canceled 9/30/47/ By Leon R. Meyer, Pres./Meyer Jewelry Co."

stock were made for the purpose of enabling Lucile to withdraw her capital investment therefrom, we are convinced that all of Lucile's stock represented an ordinary equity investment at the time it was redeemed. See *Montclair, Inc.* v. *Commissioner*, 318 F. 2d 38, 40, affirming a Memorandum Opinion of this Court, and *Wilbur Security Co.*, 31 T.C. 938, 948, affd. 279 F. 2d 657.

In view of our conclusion, petitioners' citation of *Keefe* v. *Cote*, and *Estate of Henry A. Golwynne*, both *supra*, is inapposite. Although each of those cases held that the stock redemption under scrutiny was not essentially equivalent to a dividend, each dealt with a situation wherein a bona fide corporate indebtedness, incurred in the operation of a corporate business, was temporarily capitalized into stock for the purpose of improving the credit position of the corporation. In both of these cases, there was an understanding that the corporation would redeem the shares as soon as it could do so conveniently, and pursuant to such understanding redemptions were made at such times, in such amounts and manner as to indicate clearly that they constituted in reality, although indirectly, repayments of the original debts.

In view of the above, we reject petitioners' contention that the distributions in redemption of Lucile's common stock which occurred in late 1959 or any part thereof, should be considered as constituting, either directly or indirectly, the repayment of a $25,000 debt owing to her from Jewelry.

Respondent determined that on April 13, 1959, Leon received a taxable distribution of $7,920.50 from Meyer Jewelry Co., consisting of 62 shares of Thiokol stock having a value of $127.75 per share, which he failed to report as income. At the conclusion of the trial, respondent submitted a motion for leave to file an amended answer. Such motion was subsequently granted. In his amended answer, respondent asserted that Leon received a taxable distribution from Jewelry in the amount of $10,013, representing the fair market value of 124 shares of Thiokol received on April 30, 1959, at a fair market value of $52.375 per share, and 62 shares of Thiokol received on May 4, 1959, at a fair market value of $56.75 per share.

Petitioners' primary contention with respect to this issue is that Leon contributed only 638 presplit shares of his Thiokol stock to Jewelry's capital and retained title to 62 shares. Consequently, it is urged by petitioners that Leon did not receive a distribution of 62 shares of Thiokol stock on April 13, 1959. In response to respondent's amended answer, petitioners argue that for the same reason Leon did not receive distributions of 124 and 62 shares of Thiokol stock on April 30 and May 4, 1959, respectively.

Petitioners, on brief, concede that "The record indicates that Leon on or after May 4, 1959 received 32 [split] shares out of 62 shares of

Thiokol held by Stern Brothers & Co.," having a fair market value of no more than $53.75 per share, the lowest selling price for that date. However, petitioners argue that respondent, having pleaded new matter, has not sustained his burden of proving either that the receipt of the stock in question constituted more than a return to Leon of his own property or that the shares had a value greater than $53.75 per share as of the date of delivery.

With respect to petitioners' assertion that respondent has pleaded new matter and must bear the burden of proof, we are convinced that notwithstanding the question as to which party bears the burden of proof as to this issue, the record clearly supports respondent's assertions that all 700 of the presplit shares of Thiokol were given to Meyer Jewelry Co. by Leon on or about April 1, 1959, as a capital contribution, including the 62 shares which were not sold on behalf of Jewelry. Whether the stock was transferred to Jewelry depends upon all the attendant facts and circumstances, including the intent of the parties. *Tabery* v. *Commissioner*, 354 F. 2d 422, 426, affirming a Memorandum Opinion of this Court; *Thal* v. *Commissioner*, 142 F. 2d 874; *Bank of America National Trust & Savings Assn.*, 15 T.C. 544, aff'd. 193 F. 2d 178. Initially, we note that the petition herein signed and verified by Leon specifically alleges that Leon made a capital contribution of 700 shares of Thiokol stock to Meyer Jewelry Co. on April 1, 1959. Nowhere in the petition is there any reference to Leon's alleged intent to restrict his capital contribution as to the number of shares of Thiokol stock "up to 700" necessary to effect certain alleged purposes.

The record shows that the 700 presplit shares of Thiokol were identified by 13 certificates issued in the name of Leon R. Meyer. At the time of contribution these certificates had been endorsed by Leon to Jewelry. The minutes of Jewelry's board of directors meeting dated April 1, 1959 (at which Leon acted as chairman), state that the stock certificates representing the 700 shares were endorsed by Leon to Jewelry; that Jewelry is the "owner of 700 shares of the capital stock of Thiokol"; the stock powers attached to the 13 certificates were all executed by Jewelry before delivery to Stern Bros. & Co., brokers; and the instructions to the broker were that all checks representing proceeds of sale of the 700 shares should be made payable to Jewelry.

The record also shows that from the period April 6 through April 13, 1959, 638 of these shares were sold by a broker, Stern Bros. & Co., on behalf of Meyer Jewelry Co. In order to facilitate this sale and to transfer the shares into a street name, the broker, on April 2, 1959, issued a request to the stock transfer agent of Thiokol Chemical Corp. to reissue the 700 shares in the name "Stern Brothers & Company." The shares were actually transferred on the books of Thiokol Chemical Corp. on April 27, 1959. In the meantime, a stock dividend

had been declared by Thiokol providing for two additional shares to be issued for each share presently held, in order to effect a 3 for 1 split of the stock. The stock record date for determining the proper parties entitled to this dividend was April 20, 1959. The payment date for the stock dividend was April 30, 1959. Therefore, on April 20, 1959, according to the stock record books of the Thiokol Chemical Corp., the proper party to receive the stock dividend was Leon Meyer. The stock dividend on the 638 shares which had been sold during the period April 6 through April 13, 1959, although received by Leon Meyer, had to be returned to Stern Bros. & Co. for transfer to the respective purchasers of the 638 shares. Leon did receive, however, on April 30, 1959, the stock dividend of 124 additional shares on the 62 shares which had not been sold by Meyer Jewelry Co. The original 62 shares (now one-third of the value existing prior to the split) were first received by Stern Bros. in a street name. Of this amount, 30 shares were reissued in accordance with Leon's request to Stern Bros. & Co. on May 4, 1959, to various members of his family, and 32 shares were reissued to himself. Pursuant to this instruction of Leon, these transfers were noted on the records of the stock transfer agent on May 7, 1959.

Although Meyer Jewelry Co. did not physically receive any of the 124 shares resulting from the split of the original 62 shares, this factor alone is not determinative if the intention of the parties is otherwise. *Helvering* v. *Kaufman*, 136 F. 2d 356, affirming 46 B.T.A. 924. Moreover, Jewelry's failure to recognize a receivable is not conclusive of the matter. *Doyle* v. *Mitchell Bros. Co.*, 247 U.S. 179, 187; *Commissioner* v. *North Jersey T. Ins. Co.*, 79 F. 2d 492. Since ownership of the original 62 shares had been transferred to Meyer Jewelry Co. prior to the stock split, it is clear that Jewelry, not Leon, was entitled to retain the 62 shares and receive the 124 additional shares. By permitting Leon to receive, retain, and redistribute in part these 186 shares, Jewelry, in effect, made a distribution thereof to him. We hold that this distribution is taxable as a dividend in the light of our earnings and profits computations, *supra*.

On April 20, 1959, the effective record date of the stock split, Leon was still the record owner on the books of Thiokol of the 62 shares to be split. It is petitioners' position that the 124 additional shares produced by the split came directly to Leon and not via a distribution from Jewelry. We find no merit in this argument since the record shows that on April 20, 1959, Leon was not only the record holder, per Thiokol's books of the 62 unsold shares but was also the record holder of the other 638 shares already sold by Jewelry's broker. The sale of 638 shares of Thiokol sold from April 6 to April 13, 1959, carried with the shares sold the additional shares produced by the stock

split so that the record owner was required to deliver the additional shares resulting from the split to the purchaser in the transaction effected by Stern Bros. & Co. for the account of Jewelry. We believe that this situation is equally applicable to the 62 remaining presplit shares. They had been owned for nearly 3 weeks by Meyer Jewelry Co. If they had been sold in the interim, the purchaser would have been entitled to the 124 shares arising from the split. In our opinion, Meyer Jewelry Co. was acting in its own behalf, and not as an agent of Leon, with respect to the 700 shares. Leon's interest in the 700 shares, including the 62 shares unsold, arose solely from Thiokol's delay in performing a ministerial, bookkeeping act. Leon's position was tantamount to that of a nominee. Hence, he had no legal or equitable right to retain any of the 1,400 split shares received by virtue of that position. When Leon, apparently acting in his official capacity as president and controlling stockholder of Jewelry, chose to retain the 124 and 62 split shares, he received in substance a distribution of such property from his corporation.

Respondent's amended answer alleges a fair market value of the 124 Thiokol shares, which Leon received on April 30, 1959, in the amount of $52.375 per share. The parties stipulated orally that the split Thiokol stock sold on the New York Stock Exchange on April 30, 1959, at a high of $53.875 per share and a low of $51 per share. With respect to the 62 presplit shares of Thiokol, petitioners admit that Leon received 32 of these shares on or about May 4, 1959, and that the fair market value thereof was the lowest selling price obtained on the New York Stock Exchange for the split Thiokol stock on the latter date. On that date, the parties have likewise stipulated that Thiokol stock sold on the exchange at a low of $53.75 per share and at a high of $59.75.

Notwithstanding the question as to which party should assume the burden of proof with respect to the fair market value of the Thiokol stock on the two distribution dates, we find that the record supports respondent's determinations. Where stock is listed and freely marketed in substantial amounts on a recognized exchange, the mean price between the two extreme trading prices on a given date is regarded as the fair market value for that date. *Batterman* v. *Commissioner*, 142 F. 2d 448, affirming a Memorandum Opinion of this Court. The fair market value alleged by the respondent with respect to the 124 shares received by Leon on April 30, 1959, was slightly below the midpoint between the high and low selling prices for that date, while the fair market value alleged by respondent for the 62 shares received by Leon on May 4, 1959, was the precise midpoint between the high and low selling prices for that date. In the light of the foregoing, and upon the entire record, we sustain respondent's

determination that Leon received a taxable distribution from Jewelry in the amount of $10,013, representing the fair market value of 124 and 62 shares of Thiokol stock received on April 30 and May 4, 1959, respectively.

In our computations of the earnings and profits of Jewelry, we have subtracted $9.72 in order to recognize the effects of the above distribution to Leon. Section 312(a)(3) of the 1954 Code [33] provides that when a corporation distributes property with respect to its stock, its earnings and profits shall be decreased by the adjusted basis of the property. Since Leon contributed the 700 shares of the Thiokol stock to Jewelry's capital, Jewelry's basis in the Thiokol stock would be equivalent to Leon's. See sec. 362(a)(2), 1954 Code.[34] The record indicates that Jewelry's basis in the 638 shares sold in the year ended June 30, 1959, was $100. Using these figures, Leon's (and therefore Jewelry's) basis in the 62 shares (plus the additional 124 shares received in the stock split) [35] would be $9.72. We have therefore made that deduction from Jewelry's earnings and profits for the year ended June 30, 1959, in our computations.

*Decisions will be entered under Rule 50.*

---

[33] SEC. 312. EFFECT ON EARNINGS AND PROFITS.

(a) GENERAL RULE.—Except as otherwise provided in this section, on the distribution of property by a corporation with respect to its stock, the earnings and profits of the corporation (to the extent thereof) shall be decreased by the sum of—

\* \* \* \* \* \* \*

(3) the adjusted basis of the other property, so distributed.

[34] SEC. 362. BASIS TO CORPORATIONS.

(a) PROPERTY ACQUIRED BY ISSUANCE OF STOCK OR AS PAID-IN SURPLUS.—If property was acquired on or after June 22, 1954, by a corporation—

\* \* \* \* \* \* \*

(2) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer.

[35] See sec. 305(a) and 307(a), 1954 Code. When the stock dividend is not includable in gross income, an allocation of basis takes place.